2006 ME 107

**David VILES et al.**

v.

**TOWN OF EMBDEN et al.**

Supreme Judicial Court of Maine.

Submitted on Briefs: March 22, 2006.

Decided: Aug. 31, 2006.

Edmond A. Bearor, Esq., Timothy A. Pease, Esq., Rudman & Winchell, Bangor, for plaintiffs.

Brian M. Rayback, Esq., Helen L. Edmonds, Esq., Pierce Atwood, Portland, (for Richard Hinman), Neal C. Corson, Esq., Madison, (for Town of Embden), for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

Concurring: SAUFLEY, C.J., and LEVY and SILVER, JJ.

CALKINS, J.

[¶ 1] David and Cheryl Viles appeal from a judgment entered in the Superior Court (Somerset County, *Jabar, J.*), affirming a decision of the Embden Appeals Board (Board), which rescinded a permit issued to the Vileses to build a house and garage

on their lot bordering Embden Pond. The Board's decision was the result of an appeal by Richard Hinman, an abutting neighbor. In rescinding the building permit, the Board concluded that the Vileses' lot was not a nonconforming lot of record and therefore could not be a grandfathered lot pursuant to the Embden Shoreline Zoning Ordinance. The Vileses argue that Hinman's appeal to the Board was untimely and that their lot is a buildable, nonconforming lot of record. We affirm the judgment.

## I. BACKGROUND

[¶ 2] This matter has a lengthy procedural history. The Vileses own lots 7 and 21, which are intersected by the Walker Road. They were originally part of a large tract of land on the shores of Embden Pond. Lot 7 has fifty feet of frontage on Embden Pond. Hinman owns Lot 8, which borders Lot 7. On February 13, 2003, the Vileses obtained a permit from the Embden Planning Board to build a house and attached garage on Lot 7. The permit stated the dimensions for the house as thirty-six by thirty-eight feet and twenty-four by thirty-eight feet for the garage.

[¶ 3] Eight months later Hinman wrote letters to the Embden officials complaining about the permit. At the October 9, 2003, meeting of the planning board, the Hinman complaint was discussed, and the planning board asked the code enforcement officer (CEO) to visit the lot with an official of the Department of Environmental Protection. The CEO issued a stop work order. One of the reasons given for the stop work order was that a building could not be constructed within fifteen feet of an existing wastewater treatment system. At the October 16 meeting of the planning board, Viles explained that the location of the proposed house was not within fifteen feet of an existing septic system and that the house dimensions in the building permit were incorrect. At the Vileses' request, the planning board voted to change the permit to reflect that the proposed house dimensions were thirty-six by twenty-eight feet and the garage dimensions were twenty-four by twenty-eight feet. Several days later, the CEO lifted the stop work order.

[¶ 4] Hinman filed two appeals to the Board: one seeking revocation of the permit originally issued by the planning board; and the other seeking revocation of the amended permit. The Board held a hearing, and after a recommendation from its attorney, the Board dismissed Hinman's appeals as untimely. Hinman appealed to the Superior Court, which remanded the matter to the Board for a de novo hearing. The Superior Court concluded that the appeal from the February 13 issuance of the permit was timely pursuant to the good cause exception in *Keating v. Zoning Board of Appeals of Saco*, 325 A.2d 521 (Me.1974), and that the appeal from the reissuance of the permit in October 2003 was appropriate. The Vileses filed an appeal from the Superior Court's remand order, but we dismissed the appeal as interlocutory.

[¶ 5] On remand and after a two-day hearing held in November and December 2004, the Board rescinded the building permit on the basis that Lot 7 was not a nonconforming lot of record. The Vileses appealed to the Superior Court, and it affirmed the Board's decision.

## II. DISCUSSION

A. Timeliness

[¶ 6] We must first analyze whether Hinman's appeal to the Board was timely. The provision governing appeals to the Board in the Embden Shoreline Zoning Ordinance does not contain a time within

which an appeal must be filed. Embden, Me., Shoreline Zoning Ordinance 6.3 (May 19, 1993). When zoning ordinances are silent on the time period by which an aggrieved person must filed an appeal from the issuance of a permit, we have set sixty days as that time period. *Keating,* 325 A.2d at 525. Hinman did not appeal to the Board within sixty days of the February 13 issuance of the building permit to the Vileses.

[¶ 7] The Superior Court, however, found that Hinman had shown good cause for not filing his appeal within sixty days. Specifically, the court found that (1) Hinman did not receive notice of the building permit, although it acknowledged that the ordinance did not require notice to Hinman; (2) when Hinman found out about the permit, he immediately contacted town officials, who responded by placing the matter on the agenda of the planning board and issuing a stop work order; and (3) immediately after the planning board decided not to rescind the building permit, Hinman appealed to the Board. The court concluded that these facts established good cause.

[¶ 8] In *Keating,* we held that when a court "finds special circumstances which would result in a flagrant miscarriage of justice," the time for filing an appeal may be extended "within a narrowly extended range." *Id.* at 524. We have referred to this exception to the appeal time limit as the "flagrant miscarriage of justice" exception, *Gagne v. Cianbro Corp.,* 431 A.2d 1313, 1317 (Me.1981), and the "good cause exception," *Brackett v. Town of Rangeley,* 2003 ME 109, ¶ 14, 831 A.2d 422, 427.

[¶ 9] When we review the application of the good cause exception, we review the decision of the Superior Court because the application of the exception is a judicial, and not an administrative, decision. *Id.* ¶ 17, 831 A.2d at 428. We have previously applied the abuse of discretion standard of review to a Superior Court's determination of the existence of good cause and the clearly erroneous standard to the court's factual findings. *Gagne v. Cianbro,* 431 A.2d at 1317–18.

[¶ 10] Nonetheless, both parties urge us to apply a de novo standard of review, although Hinman would have us apply the clear error standard to the court's factual findings. We decline to do so. The de novo standard is generally reserved for questions of law, but the determination of whether the good cause exception can and should be applied in a particular case is not a purely legal question, even when the facts are undisputed. The exception as it was announced in the *Keating* case, and as it has been applied in subsequent cases, is a determination of whether the appeal should be allowed "in light of all the circumstances bearing on all the equities of the situation." *Gagne v. Lewiston Crushed Stone Co.,* 367 A.2d 613, 619 (Me.1976).

[¶ 11] Our cases mention several factors to be considered when determining whether the good cause exception is appropriate. *See Gagne v. Cianbro,* 431 A.2d at 1317 (finding that the Superior Court appropriately analyzed "the competing interests of builder and nearby landowners"). Because the court uses its discretion in weighing the various factors and "all the equities of the situation," the abuse of discretion standard is the appropriate one to apply.

[¶ 12] In discussing the factors to be utilized by the courts in determining whether there is good cause to allow a late appeal, it is useful to recall the rationale in *Keating* for the good cause exception. The need for a good cause exception primarily stems from the lack of notice of the issuance of the building permit to abutting

landowners or other persons who may be aggrieved by its issuance. *Keating*, 325 A.2d at 524. Maine statutes do not require municipalities or permit holders to provide notice to abutting landowners of the issuance of a building permit. Some municipalities may have enacted notice requirements in their ordinances. *See, e.g., Brackett*, 2003 ME 109, ¶¶ 4, 19, 831 A.2d at 425, 428. In *Keating* we acknowledged the difficulty of a notice requirement. 325 A.2d at 524–25. The good cause exception was designed because the lack of a notice requirement may mean that an abutting landowner does not learn of a permit until the time period for appeal has expired.

[¶ 13] Therefore, when a court examines whether the good cause exception is applicable to a situation, it starts with determining whether the appellant received notice of the issuance of the permit. Given the rationale in *Keating*, lack of notice is a key factor, but it is not a determinative factor. *Gagne v. Lewiston Crushed Stone*, 367 A.2d at 619. Another factor is the amount of time the appellant waited to file the appeal after obtaining actual knowledge of the permit. *Brackett*, 2003 ME 109, ¶ 21, 831 A.2d at 428; *Gagne v. Cianbro*, 431 A.2d at 1317. Still other factors that may be appropriate involve whether the municipality violated its own ordinance and whether the permit holder violated the terms of the permit. *Brackett*, 2003 ME 109, ¶ 18, 831 A.2d at 428.

[¶ 14] The question before us is whether the Superior Court abused its discretion in applying these factors and concluding that good cause existed for Hinman's late appeal to the Board. As stated above, the court found that Hinman did not receive notice of the issuance of the permit and immediately contacted Town officials when he learned about it. In addition to reciting these facts, which it relied upon in finding good cause for the late filing of an appeal,

the court also made several background findings. The building permit was issued on February 13, 2003, and construction on the Vileses' home had not commenced before or during the summer of 2003. Hinman was in Florida during the winter and did not learn about the permit until he saw stakes on the lot in mid-September. Hinman immediately contacted the CEO, a town selectman, and the chairman of the planning board. The chairman wrote to the CEO on October 4, and Hinman raised questions about the permit at the planning board meeting on October 9. The stop work order was lifted on October 19, and Hinman filed the appeal on October 29.

[¶ 15] It is useful to compare the factual scenarios in two cases in which we held that there was good cause for a late appeal with a case in which we held that there was not good cause. In *Brackett*, we vacated the Superior Court's judgment, which affirmed the decision of the Board of Appeals that the neighbor's appeal was untimely. 2003 ME 109, ¶ 1, 831 A.2d at 424. We determined that several facts compelled us to grant the good cause exception: (1) the Town violated its own ordinances when it issued the building permit in that, among other violations, it failed to give required notice to the neighbor; (2) the permit holder violated the terms of the permit when he built the cottage closer to the shore than allowed in the permit, and the cottage contained more square feet than the permit authorized; and (3) the neighbor acted promptly when learning of the building violations. *Id.* ¶¶ 18–21, 24, 831 A.2d at 428–29.

[¶ 16] In *Gagne v. Cianbro*, we affirmed the Superior Court's determination that a flagrant miscarriage of justice would result if the neighbors were not allowed to appeal. 431 A.2d at 1318. There, the following facts were relevant: (1) the neighbors received no notice of the building permit

until eight months after it was issued, when they saw construction activity; (2) the history of litigation between the parties was such that the permit holder had reason to anticipate the neighbors' opposition to the permit; and (3) as soon as the neighbors learned about the permit, they instituted legal action. *Id.* at 1317.

[¶ 17] In *Wilgram v. Town of Sedgwick,* we vacated a Superior Court ruling finding good cause. 592 A.2d 487, 489 (Me.1991). There, we held that there was no good cause exception to permit an appeal seven months after the issuance of a building permit when the abutting neighbor waited seventy-six days after she knew that construction was underway before filing an appeal to the Board of Appeals. *Id.* at 488.

[¶ 18] Comparing the factual scenarios in these cases with the facts found by the Superior Court in the instant case, we cannot conclude that the court abused its discretion when it found that Hinman demonstrated good cause for his untimely appeal. The facts are that Hinman did not receive notice of the permit and first knew of its issuance when he saw stakes in mid-September. Thereafter, he acted promptly to bring the matter to the attention of the appropriate officials, who found his complaints to have enough merit that a stop work order was issued.[1] In light of *Brackett* and *Gagne v. Cianbro,* we affirm the Superior Court's holding that Hinman had good cause for his late appeal.

B. Nonconforming Lot

[¶ 19] When the Superior Court acts in its appellate capacity, we review the operative decision directly. *Gensheimer v. Town of Phippsburg,* 2005 ME 22, ¶ 7, 868 A.2d 161, 163–64. Contrary to the Vileses' suggestion that the planning board decision is the operative decision, we conclude that the Board's decision is the appropriate one to be reviewed. The Embden Shoreline Zoning Ordinance does not limit the authority of the Board to appellate review, and therefore, the Board was required to, and did, take evidence, make findings, and apply the Ordinance. *See id.* ¶ 8, 868 A.2d at 164. We review de novo the interpretation of a zoning ordinance. *Peregrine Developers, LLC v. Town of Orono,* 2004 ME 95, ¶ 9, 854 A.2d 216, 219. We liberally construe zoning provisions that limit nonconforming uses because of the underlying policy to gradually limit nonconforming uses. *See Brackett,* 2003 ME 109, ¶ 16, 831 A.2d at 427.

[¶ 20] The portion of the Embden Shoreline Zoning Ordinance related to this appeal concerns the exemption of certain nonconforming lots from obtaining a variance before a building permit will be issued. Section 4.4.1 of the Ordinance states in pertinent part:

A non-conforming lot of record as of the effective date of this Ordinance or amendment thereto may be built upon, without the need of a variance, provided that such lot is in separate ownership and not contiguous with any other lot in the same ownership, and that all provisions of this Ordinance except lot size and frontage can be met.

[¶ 21] The Board found that Lot 7 was not a nonconforming lot of record and no

---

1. In *Brackett v. Town of Rangeley,* when we determined that the neighbor had good cause to bring the untimely appeal, we considered the factor that the municipality violated its own ordinance when it granted the building permit. 2003 ME 109, ¶¶ 18, 19, 831 A.2d at 427, 428. We do not consider the factor of whether the municipality violated the Ordinance in the present case because this question was not before the Superior Court when it made its good cause determination. We review the applicability of the good cause exception as of the time the court determined that it applied.

building permit could be issued for it. The parties agree that Lot 7 is nonconforming, but they do not agree that it was a lot of record at the time of the adoption of the Ordinance.

[¶ 22] The Board issued detailed findings. It found that at the time of the enactment of the Ordinance in 1972, what is now described as Lot 7 was a portion of a large tract of land. The large tract was a nonconforming lot of record. By a deed dated March 21, 1980, the owner of the large tract conveyed a portion of that tract to the Crosses. The portion conveyed had frontage on Embden Pond of approximately fifty feet and extended southerly for one hundred eighty feet. This is the lot now referred to as Lot 7. In 1983, the Crosses obtained, from the same owner of the large tract, a parcel of land in excess of eighty acres that was contiguous to Lot 7. What is now referred to as Lot 21 was part of this parcel. The Board concluded that because this parcel was conveyed to the Crosses by a separate deed from the conveyance of Lot 7, the conveyance did not affect the nonconforming nature of Lot 7, and Lot 7 retained its character as a nonconforming lot of record. In 2003, the Crosses conveyed Lots 7 and 21 to the Vileses. This conveyance was in a single deed, and the Board determined that this conveyance caused Lot 7 to become a nonconforming lot for which no building permit could be issued.

[¶ 23] Both parties dispute the findings of the Board. The Vileses contend that because the deed to them from the Crosses separately references the fifty by one hundred eighty-foot lot that is now known as Lot 7, that lot retained its separate identity as a nonconforming lot of record. Hinman, on the other hand, argues that insofar as the Board found that Lot 7 was a nonconforming lot of record at the time the Ordinance was enacted in 1972 because

it was part of a larger nonconforming lot of record, the Board erred. Hinman contends that Lot 7 did not become a lot of record until it was separated from the larger parcel in 1980 and its own boundaries were described in a recorded document.

[¶ 24] In *Camplin v. Town of York*, 471 A.2d 1035 (Me.1984), we interpreted a grandfather clause that exempted "lots of record" from complying with an amendment to the zoning ordinance. In that case, as here, the term "lots of record" was undefined in the ordinance. We said that we give undefined terms "their common and generally accepted meanings unless the context requires otherwise." *Id.* at 1038. We held that the term applied to lots that were recorded at the time of the amendment and did not apply to lots that were developed or subdivided after the date of the amendment. *Id.* at 1039.

[¶ 25] Applying the common and generally accepted definition of "lots of record" from *Camplin*, we agree with Hinman that the Board erred as matter of law when it concluded that Lot 7 was a nonconforming lot of record in 1972. In 1972 Lot 7 did not exist as a separate lot. It was only part of a larger tract of land. Lot 7 did not become a separate lot until its boundaries were described in the 1980 deed from the owner of the larger tract to the Crosses, and it did not become a lot of record until the 1980 deed was recorded, which was after the effective date of the Ordinance.

[¶ 26] The Vileses would have us conclude that any small parcel of land that is carved out of a larger nonconforming lot of record also becomes a nonconforming lot of record. Their interpretation of a "lot of record" would defeat the overall purpose of the Embden Shoreline Zoning Ordinance.

[¶ 27] In summary, although we do not agree with the legal analysis of the Board, we agree with its conclusion that Lot 7 is not a nonconforming lot of record. Because it is not a nonconforming lot of record, the building permit should not have been issued, and the Board's decision to rescind it was appropriate.

The entry is:

Judgment affirmed.

LEVY, J., with whom SAUFLEY, C.J., and SILVER, J., join, concurring.

[¶ 28] The Court's opinion brings closure to a zoning dispute that arises from a shoreland zoning permit issued in February 2003. A principal reason why it has taken more than three years to resolve the dispute is that Hinman was not notified of the Vileses' initial permit application because neither the Town of Embden's shoreland zoning ordinance, nor Maine's shoreland zoning statutes, 38 M.R.S. §§ 435–449 (2005), require notice of the application to the neighbors who own property in close proximity to the parcel for which the permit is sought. If notice had been provided in this case, it is reasonably possible that Hinman's objections to the Vileses' proposed construction would have been considered and resolved by the Embden Planning Board in February 2003, instead of being finally resolved by today's decision.

[¶ 29] Both the persons who wish to build on their land, and the neighbors who will be most affected by it, benefit if any dispute regarding the proposal is considered before, and not after, a land use permit is issued. *See Brackett v. Town of Rangeley,* 2003 ME 109, ¶ 25, 831 A.2d 422, 430 ("The time for litigating in ordinary cases remains prior to the start of construction."). This case underscores the need for the Legislature to consider whether some form of notice to neighboring property owners should be required in connection with shoreland and similar land use permit applications. *See, e.g.,* N.J. STAT. ANN. § 40:55D–12(b) (West Supp. 2006) (requiring notice by personal service or certified mail "to the owners of all real property as shown on the current tax duplicates, located in the State and within 200 feet in all directions of the property which is the subject of [the] hearing").