2009 ME 82

**Lorraine DAVIS et al.**

v.

**SBA TOWERS II, LLC f/k/a National Grid Communications, Inc.**

Supreme Judicial Court of Maine.

Argued: June 17, 2009.
Decided: Aug. 6, 2009.

88 ██ 

Christopher P. Mulligan, Esq., Jonathan S. Springer, Esq. (orally), Bosen & Springer, P.L.L.C., Portsmouth, NH, for SBA Towers II, LLC.

Chris Vaniotis, Esq., Lori Londis Dwyer, Esq. (orally), Bernstein Shur Saw-

yer & Nelson, Portland, ME, for Lorraine Davis et al.

Terry W. Calderwood, Esq., Gibbons & Calderwood, L.L.P., Camden, ME, for amicus curiae Town of Lincolnville.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

SILVER, J.

[¶ 1] SBA Towers II, LLC appeals from a judgment of the Superior Court (Waldo County, *Hjelm, J.*) pursuant to 30–A M.R.S. § 2691(3)(G) (2008) and M.R. Civ. P. 80B. The judgment vacated a decision by the Town of Lincolnville Board of Appeals, ordering the approval of a project by SBA's predecessor-in-interest, National Grid Communications, Inc. (Gridcom),[1] to build a 190–foot telecommunications tower in the Town. The Board of Appeals ordered the approval of the project after the Lincolnville Planning Board repeatedly denied Gridcom's application pursuant to various ordinances. Gridcom contends that: (1) Lincolnville Land Use Ordinance (Ordinance) § 19.7.2(12) (June 19, 2001)[2] is unconstitutional on its face, as it gives the Planning Board unfettered discretion to deny applications; (2) the Ordinance is unconstitutional as applied by the Planning Board, which interpreted it in an arbitrary manner; and (3) the Superior Court erred in determining that there was insufficient evidence to compel the Planning Board to approve Gridcom's application. Lorraine Davis[3] argues that Gridcom has no standing to raise the constitutional challenge. We vacate the judgment of the Superior Court.

## I. BACKGROUND

[¶ 2] Gridcom submitted an application to the Town of Lincolnville Planning Board, requesting permission to build a telecommunications tower in the Town. The proposed tower would be 190 feet tall, and would be constructed within a fenced compound with an area of approximately 5625 square feet. The tower would be a wireless communications facility that can house up to four telecommunications carriers. Other than the 5625 square feet to be cleared (and the access driveway), the area is otherwise undeveloped, with heavy tree cover. The proposed tower is located between Bald Rock Mountain and Penobscot Bay, in close proximity to both.

[¶ 3] An application for a telecommunications tower will be denied if it falls within one of Lincolnville's restricted zones. Ordinance § 19.5 (June 19, 2001). Even if the proposed tower does not fall within one of the restricted zones, as is the case with Gridcom's tower, it may be subject to certain additional requirements if it is found to be within one of the scenic views, or "view sheds," illustrated on the town's Comprehensive Plan Scenic View Map (Scenic View Map). Ordinance

---

1. National Grid Communications, Inc. (Gridcom), which was initially involved in this matter, has since been acquired by SBA Towers II, LLC. Pursuant to the order entered in this Court, SBA replaces Gridcom as the appellant and interested party in this case. However, for purposes of clarity, and because Gridcom was involved at each stage of this matter, we refer to the appellant as Gridcom throughout this opinion.

2. Although the Lincolnville Land Use Ordinance appears to have been adopted June 16, 1998, it was subsequently amended June 19, 2001, to include section 19, the wireless communications section, which is at the center of this appeal.

3. The group of petitioners in the Rule 80B appeal below consists of several community members. We refer to the petitioners collectively as Lorraine Davis, whose name appears first on all court documents.

§ 19.7.2(12). Although a municipality may deny an application if the denial is supported by substantial evidence, no ordinance may prohibit, or effectively prohibit, telecommunications towers altogether. 47 U.S.C.S. § 332(c)(7)(B)(i), (iii) (2002).

[¶ 4] After considering Gridcom's application, the Planning Board determined that the proposed tower fell within a scenic view as indicated on the Scenic View Map. Accordingly, the tower must not "have an unreasonably adverse impact upon [the] scenic view." Ordinance § 19.7.2(12). An "unreasonably adverse impact" is determined by considering seven factors, which are enumerated in the Ordinance.[4]

[¶ 5] This appeal follows three decisions by the Planning Board rejecting Gridcom's application and incorporated site plan, with the first two decisions relying solely upon the seven unreasonably-adverse-impact factors in Ordinance § 19.7.2(12) and the third decision relying on section 18 of the Ordinance. Each of the Planning Board's decisions denying the application was followed by an appeal by Gridcom to the Board of Appeals, and each appeal resulted in a remand of the petition to the Planning Board. The third and final Board of Appeals decision remanded the matter to the Planning Board with orders to approve the application.

[¶ 6] At issue before this Court is the Planning Board's second decision, in which it weighed the seven factors, choosing to define two terms among the seven factors differently than they had been defined in the Board's first hearing and subsequent decision. The two terms that the Board redefined were "tree line" in subsection (1) and "vegetative screening" in subsection (4). After making a number of findings and balancing the seven factors to determine the cumulative effect, the Planning Board rejected Gridcom's application.

[¶ 7] Gridcom appealed the Planning Board's second denial to the Board of Appeals, which determined that the Planning Board's decision to redefine "tree line" was procedurally improper, substantively erroneous, and ultimately unconstitutional. The Board of Appeals further found that the evidence did not support the Planning Board's ultimate conclusion that the tower would have an unreasonably adverse impact on the scenic view. The Board of Appeals remanded the matter to the Planning Board to approve the application in accordance with section 19 of the Ordinance. Following the decision of the Board of Appeals, Davis filed a Rule 80B appeal in the Superior Court, which was stayed pending the Planning Board's decision on remand.

[¶ 8] On remand, the Planning Board chose to reconsider the application pursuant to section 18 of the Ordinance, and it again denied the application. *See* Ordinance § 18 (June 16, 1998). Section 18 applies generally to the review of commercial site plans, whereas section 19 applies specifically to wireless communications. As discussed further below, the Board's findings with respect to section 18 are not

4. The seven factors are: (1) the proposed tower's visibility above the tree line from Bald Rock Mountain, public roads, public land, and the Bay; (2) the type, number, height, and proximity of other existing structures and features within the same line of sight as the tower; (3) the extent of the tower's visibility altogether (from the viewpoints listed in the first factor); (4) the amount of vegetative screening; (5) the distance of the tower from the viewpoint and the tower's location within the designated scenic view (as indicated on the Scenic View Map); (6) the evidence set forth in the visual impact assessment submitted with the application and any related conclusions; and (7) the existence of reasonable alternatives that would allow the facility to function consistent with its purpose. Lincolnville Land Use Ordinance (Ordinance) § 19.7.2(12)(*l*)(*l*)-(7)(June 19, 2001).

relevant to this appeal. Gridcom filed its third appeal with the Board of Appeals, which remanded the matter for a third time, ordering the Planning Board to approve the application in accordance with section 18, Following the third decision by the Board of Appeals, the Planning Board approved Gridcom's application. Davis appealed both the second and third decisions of the Board of Appeals to the Superior Court. The two appeals were consolidated.

[¶ 9] In considering the consolidated Rule 80B appeal, the Superior Court did not reach the merits of Davis's section 18 argument, and it vacated the order of the Board of Appeals pertaining to section 19 on the basis that: (1) Gridcom did not meet its burden of persuasion before the Planning Board, and (2) the record supported the Planning Board's conclusion that the standards were not satisfied. Accordingly, the court ordered the Board of Appeals to further remand the matter to the Planning Board to deny the application. Gridcom filed this appeal, which involves only section 19.[5]

## II. DISCUSSION

■ [¶ 10] In a Rule 80B appeal to the Superior Court, we review directly the action of the board below. *Waltman v. Town of Yarmouth*, 592 A.2d 1079, 1080 (Me.1991). When, as here, the Board of Appeals acts only in an appellate capacity, and does not serve as fact-finder, we review directly the decision of the Planning Board "for error of law, abuse of discretion or findings not supported by substantial evidence in the record." *Veilleux v. City of Augusta*, 684 A.2d 413, 415 (Me.1996); *see Gensheimer v. Town of Phippsburg*, 2005 ME 22, ¶ 7, 868 A.2d 161, 164.

### A. Gridcom's Standing

■ [¶ 11] Davis's contention that Gridcom lacks standing is founded upon a clause in Gridcom's lease stating that the lease would be null and void in the event Gridcom failed to commence rent payments within two years of the date of the lease, which was April 5, 2005. By its terms, the lease does not expire until April 2010. Davis offers no proof, nor even a reasonable inference, that Gridcom had not commenced its payment of rent before April 5, 2007. After reviewing the record, we are not persuaded by Davis's argument, and we conclude that Gridcom has standing to bring this challenge.

### B. Facial Constitutionality of Ordinance § 19.7.2(12)

■ [¶ 12] Gridcom contends that section 19.7.2(12) is facially unconstitutional because the Scenic View Map is unclear and difficult to interpret. Specifically, Gridcom argues that an applicant cannot necessarily determine whether its project falls within a view shed on the map, and whether the applicant must therefore comply with section 19.7.2(12). Gridcom's constitutional challenge fails for two reasons. First, notwithstanding the possibility that the map may lack clarity in some areas, none of the map's alleged defects affect Gridcom in this case. The proposed tower falls squarely within a defined view shed. Second, Gridcom raised no objection at the hearing to the Planning Board's denotation of the tower in the middle of one of the view sheds on the map, and, further, Gridcom addressed the seven factors in its application and site plan, demonstrating that the company believed the factors were

---

**5.** The Town of Lincolnville filed a brief as amicus curiae arguing only that the Ordinance does not violate Maine law.

applicable to its proposed tower. Therefore, Gridcom failed to preserve the issue for appeal. *See Wells v. Portland Yacht Club,* 2001 ME 20, ¶ 5, 771 A.2d 371, 373.

### C. Application of Ordinance § 19.7.2(12)

[¶ 13] Because Gridcom's proposed tower is within one of the view sheds located on the map, the tower must not "have an unreasonably adverse impact upon [the] scenic view." Ordinance § 19.7.2(12). An "unreasonably adverse impact" is defined as a tower "excessively out-of-character with the designated scenic resources affected, including existing buildings, structures, and features within the designated scenic resource," which "would significantly diminish the scenic value of the designated scenic resource." Ordinance § 22 (June 16, 1998). Whether an unreasonably adverse impact exists is determined by considering seven factors. Ordinance § 19.7.2(12)(1)(1)-(7).

[¶ 14] Gridcom contends that the Planning Board interpreted and applied the seven factors of section 19.7.2(12) in an unconstitutional manner, thereby allowing the Board to make arbitrary decisions about any application that comes before it. Gridcom further asserts that the Planning Board's alteration of certain definitions was erroneous and inconsistent with other sections of the Ordinance.

■■■ [¶ 15] Undefined and ambiguous terms and expressions contained in an ordinance must be construed "reasonably with regard to both the objects sought to be obtained and to the general structure of the ordinance as a whole." *H.E. Sargent, Inc. v. Town of Wells,* 676 A.2d 920, 923 (Me.1996) (quotation marks omitted). The provisions of an ordinance should be construed harmoniously so as not to render ineffective particular provisions. *See Jade*

*Realty Corp. v. Town of Eliot,* 2008 ME 80, ¶ 8, 946 A.2d 408, 411. Further, "[w]hen a reasonable interpretation of a statute would satisfy constitutional requirements, we apply that interpretation." *Driscoll v. Mains,* 2005 ME 52, ¶ 6, 870 A.2d 124, 126. The same principle applies to ordinances.

[¶ 16] The Planning Board considered the seven factors enumerated in the Ordinance to determine whether the tower would have an unreasonably adverse impact on the scenic view. At the center of Gridcom's argument are three of the seven factors, which were redefined by the Planning Board between the first hearing and the second hearing. Gridcom specifically points to subsections (1), (4), and (7), all of which, it contends, were improperly interpreted by the Planning Board. Those subsections provide:

1. The extent to which the proposed wireless telecommunications facility is visible above tree line, from the viewpoint(s) of the impacted designated scenic resource as viewed from the public road, public land or public waterway;

 . . . .

4. The amount of vegetative screening;

 . . . .

7. The presence of reasonable alternatives that allow the facility to function consistent with its purpose.

Ordinance § 19.7.2(12)(1)(1), (4), (7).

[¶ 17] With respect to subsection (1), Gridcom argues that the Planning Board used two different definitions of the term "tree line," [6] and that its second and final definition of the term is inconsistent with another section of the Ordinance that allows towers to be up to 195 feet tall. Although Gridcom argues that the Plan-

---

6. "Tree line" is not defined in the definition section of the Ordinance.

ning Board's decision to redefine the term was also procedurally improper, we need not address this claim because we reach a conclusion in Gridcom's favor on substantive grounds.

[¶ 18] Initially, the Planning Board defined "tree line" as "where the trees meet the horizon" when viewed from the Bay, explicitly choosing that definition instead of "above the tree canopy." The Planning Board also held that the definition of "tree line" when viewed from Bald Rock Mountain would be where the trees meet "the edge of the water." Although the appeal from this initial decision did not involve the definition or interpretation of the individual factors, the Planning Board chose to redefine the term on remand from that appeal.[7] "Tree line" was redefined to mean the true height of the average-sized trees. The average height of the trees in the area was determined by the Planning Board to be fifty feet at the first hearing, yet the Board appeared to adopt sixty-five to eighty feet as the average height at the second hearing.[8]

[¶ 19] Gridcom contends that, under this new definition, any telecommunications tower in that area would be above the tree line, and that the new definition is inconsistent with Ordinance § 19.7.2(1), which allows telecommunications towers to be up to 195 feet tall. We agree.

[¶ 20] The second definition of "tree line," upon which the Planning Board ultimately settled, is inconsistent with Ordinance § 19.7.2(1). If "tree line" is defined as the height of the average trees, any tower close to 195 feet would be visible "above [the] tree line" pursuant to Ordinance § 19.7.2(12)(1)(1). Although the record includes inconsistent evidence as to the average height of the trees in the area, there was no evidence reflecting a height taller than eighty-six feet. Therefore, any tower higher than eighty-six feet would be seen "among the tree canopies," and subsection (1) would never be decided in an applicant's favor. Such a result would render section 19.7.2(1) ineffective, *see Jade Realty Corp.*, 2008 ME 80, ¶ 8, 946 A.2d at 411, and could not have been intended.

[¶ 21] Furthermore, the Planning Board's second definition of "tree line" causes two of the factors to mirror each other in any case where the tower will be placed in a wooded area. A fact-finder would come to the same result for subsection (1)—the extent the tower is visible *above the tree line* from certain viewpoints—as subsection (3)—the extent to which the tower is visible *altogether* from those same viewpoints. (Emphasis added.) The Planning Board made essentially the same findings with respect to both subsections, a result that likely was not contemplated when the Ordinance was adopted.

[¶ 22] When we are tasked with construing "an ambiguous, undefined term in a zoning ordinance," we must reasonably consider the ordinance's objectives and its general structure as a whole. *H.E. Sargent*, 676 A.2d at 923. Because we will

---

7. The Planning Board initially denied the application based on the false notion that if one of the seven factors failed, the application should be denied. The Board of Appeals remanded the matter to the Planning Board to consider the seven factors as a whole, but did not suggest that on remand the Planning Board should redefine or reinterpret any definitions in subsections (1), (4), or (7).

8. There is conflicting evidence as to the average height of the trees in the area, with estimates from fifty to eighty-six feet. The evidence best supports the Board's finding of sixty-five to eighty feet at the second hearing. However, none of the varying estimates materially change the analysis under either definition of "tree line."

not read one provision of an ordinance to conflict with another provision when there is an alternative, reasonable interpretation that yields harmony, *see Pinkham v. Morrill,* 622 A.2d 90, 95 (Me.1993); *see also Jade Realty Corp.,* 2008 ME 80, ¶ 8, 946 A.2d at 411, we hold that the Planning Board's first definition—"where the trees meet the horizon" or where the trees meet "the edge of the water"—should be used to define the term. Accordingly, the Planning Board's original finding—that the proposed tower would not pierce the top of the tree line—results in a positive outcome for Gridcom with respect to subsection (1).

[¶ 23] Gridcom argues that the Planning Board also redefined another one of the seven factors on remand—subsection (4), the amount of vegetative screening. Although the Planning Board initially determined that the proposed tower met the requirements and elements of subsection (4), finding that "it would not be possible to see any of the structures associated with the tower" from the viewpoint of Bald Rock Mountain, nearby houses, or the Bay, the Planning Board redefined the term "vegetative screening" on remand and appeared to come to the opposite conclusion. Initially, it seems vegetative screening was only required to "screen the site features from nearby houses and from the Bay." As a result, the Planning Board initially found this subsection in Gridcom's favor. As redefined, the Planning Board found that there would be no vegetative screening of the tower above the average height of the trees.

[¶ 24] At first glance, the lack of a definition for "vegetative screening," or any detail as to what amount would be adequate, would cause any conclusion as to subsection (4) to be purely arbitrary, *see Stucki v. Plavin,* 291 A.2d 508, 510 (Me. 1972), as evidenced by the Planning Board's ability to materially alter the sub-section and come to an opposite conclusion with no new evidence. However, considering the Ordinance as a whole, we hold that the Planning Board's first interpretation of subsection (4) is a reasonable interpretation of the vegetative screening requirement that permits the subsection to be both constitutional and harmonious with other sections of the Ordinance. *See Pinkham,* 622 A.2d at 95; *Stucki,* 291 A.2d at 510.

[¶ 25] Although the definition section of the Ordinance does not define "vegetative screening," it does define "vegetation" to include only "live" trees, shrubs, and other plants. Unless an applicant were to screen a tower with imitation foliage, a 190–foot tower such as Gridcom's, which is otherwise a permissible height pursuant to section 19.7.2(1), could never be properly screened. Accordingly, we conclude that the only reasonable interpretation of sub-section (4), in order to be consistent with other sections of the Ordinance, is the interpretation of "vegetative screening" that was originally adopted by the Planning Board. Pursuant to that interpretation, the Planning Board found that "there is sufficient vegetative screening" because "it would not be possible to see any of the structures associated with the tower" from the viewpoint of Bald Rock Mountain, nearby houses, or the Bay. Subsection (4) is therefore determined in Gridcom's favor.

[¶ 26] Finally, Gridcom implies in its brief that the Planning Board erroneously required a mitigation plan pursuant to sub-section (7), which asks whether there are "reasonable alternatives that allow the facility to function consistent with its purpose." Ordinance § 19.7.2(12)(1)(7). Gridcom contends that a mitigation plan is not required by the Ordinance. Although Gridcom's contention as to the Ordinance is correct, its interpretation of the Planning Board's findings is erroneous. The

Board's findings about the absence of a mitigation plan were made pursuant to section 18, not section 19. The Superior Court did not reach any issues pertaining to section 18, and Gridcom does not challenge section 18 on appeal. In fact, the Board found Ordinance § 19.7.2(12)(1)(7) in Gridcom's favor, noting that there were no available technological alternatives.

[¶ 27] Nevertheless, we hold that the Planning Board's modified definitions of "tree line" in subsection (1) and "vegetative screening" in subsection (4) constituted errors of law, which contributed to the denial of Gridcom's application. Subsections (1) and (4), as the Board correctly interpreted them initially, support Gridcom's application. Subsection (7) was also found in Gridcom's favor. As conceded by Davis at oral argument, the Planning Board's findings with respect to subsections (2) and (5) appeared to be neither positive nor negative.[9] Therefore, subsections (2) and (5) were not found to be factors contributing to an unreasonably adverse impact on the scenic view. However, the Planning Board found that subsections (3) and (6) weigh against Gridcom. We therefore address Gridcom's final contention—that the evidence in the record was sufficient to compel the Planning Board to approve the project.

## D. Sufficiency of the Evidence Offered by Gridcom

[¶ 28] Gridcom bears the burden of establishing the factual elements necessary for the grant of its application. *See Gensheimer*, 2005 ME 22, ¶ 18, 868 A.2d at 166. We are required to affirm the Planning Board's decision denying Gridcom's application "unless the evidence before the Board would compel a positive finding." *Perrin v. Town of Kittery*, 591 A.2d 861, 863 (Me.1991). Gridcom argues that the evidence before the Planning Board compelled it to approve the application. We must determine whether—considering the Board's negative findings with respect to subsections (3) and (6)—the Planning Board was nevertheless compelled to approve Gridcom's application.

[¶ 29] The seven factors balanced by the Planning Board, which ultimately led to the denial of the application, included: (1) the proposed tower's visibility above the tree line from Bald Rock Mountain, public roads, public land, and the Bay; (2) other existing structures and features within the same line of sight as the tower; (3) the extent of the tower's visibility altogether (from the viewpoints listed in the first factor); (4) the amount of vegetative screening; (5) the distance of the tower from the viewpoint and the tower's location within the view shed (as indicated on the Scenic View Map); (6) the evidence set forth in the visual impact assessment submitted with the application and any related conclusions; and (7) the existence of reasonable alternatives that would "allow the facility to function consistent with its purpose." Ordinance § 19.7.2(12)(1)(1)-(7). We now consider the Planning Board's

---

9. A review of the minutes from the first and second hearing show that the Planning Board initially voted down a motion that the tower failed subsection (2), a result that appears to be in Gridcom's favor. The Board's finding at the second hearing with respect to subsection (2) was a neutral statement. One of the Board members later cited subsection (2) as a negative for Gridcom, but the other members did not. With respect to subsection (5), at the first hearing, the Planning Board voted against a motion that stated that the tower failed subsection (5). This also appears to have resulted in ·Gridcom's favor. The Board's finding at the second hearing with respect to subsection (5) was a neutral statement. As with subsection (2), one Board member later cited subsection (5) as a negative for Gridcom, but the others did not.

reliance on subsections (3) and (6) in deny-ing Gridcom's application.

[¶ 30] With respect to subsection (3), the Planning Board determined that the tower would be visible from several points. There was ample testimony from community members on this point. The Planning Board also relied on a report that questioned whether Gridcom's photo sim-ulations would be accurate in the winter when some trees have no leaves. Evi-dence in the record therefore supports the Board's finding. However, it is unclear how any tower close to 190 feet would satisfy subsection (3) if Gridcom's tower does not. To be read harmoniously with Ordinance § 19.7.2(1), which allows for towers to be up to 195 feet tall, subsection (3) cannot be interpreted in a way that would preclude a tower merely because it is visible within the tree canopy. *See* *Pinkham,* 622 A.2d at 95. With the trees in the area being anywhere from fifty to eighty-six feet, any tower above that height would be visible. It is therefore not a question of *whether* the tower would be visible from particular points in Lincoln-ville, but rather *how* visible.

[¶ 31] Although it may be seen from several points within the tree canopy, the Planning Board found that the tower would be at least one thousand feet away from the nearest property. In addition, the tower would be surrounded by a heavi-ly wooded area. Further, Gridcom's rep-resentative explained to the Planning Board that Gridcom would use a small area of land and would not need to clear a large area of trees to build the tower. The access road would be screened and not visible. The Planning Board repeatedly referred to Gridcom's failure to visually alter the tower in a way that preserves the scenic view from Bald Rock Mountain, yet it offers no reasonable suggestions as to how an applicant might alter the tower, other than to make it shorter, a suggestion that conflicts with the authorization of Or-dinance § 19.7.2(1) for a 195-foot tower.

[¶ 32] Regarding subsection (6), the Planning Board found that Gridcom did not meet its burden of establishing that the tower satisfies that subsection because the photos in Gridcom's visual impact as-sessment were of poor quality, and the assessment was insufficient in projecting what the area would look like once a num-ber of trees are cleared to build the tower. We agree that the photo simulations were not of the highest quality. However, Grid-com's application and incorporated site plan offer an abundance of evidence con-cerning how the company would minimize the visual impact of the tower. Gridcom has chosen an area with heavy tree cover. It plans to clear as few trees as possible to build the tower, leaving a large wooded area to serve as a buffer. It provided photographs of various viewpoints in Lin-colnville, from which the proposed tower cannot be seen. In addition, it produced photo simulations of how the tower would appear within the tree canopy when viewed from Bald Rock Mountain. The fact that those photos were not of the highest quality does not justify a denial of Gridcom's application. Furthermore, the low quality may be partially attributed to the fact that the tower would be one-third of a mile away from Bald Rock Mountain, and, therefore, the photos may offer the same distant view as an individual would have when standing at that location.

[¶ 33] Accordingly, we hold that Grid-com met its "burden of establishing the factual elements necessary for the grant of [its] application." *Gensheimer,* 2005 ME 22, ¶ 18, 868 A.2d at 166. Five of the seven factors do not result in an adverse impact upon the scenic view, and the Plan-ning Board's findings with respect to the remaining two factors—subsections (3) and

(6)—do not rise to the level necessary to support a denial of the application. We conclude that the evidence before the Planning Board therefore compelled a positive finding. *See Perrin,* 591 A.2d at 863.

The entry is:

Judgment of the Superior Court vacated. Remanded to the Superior Court with instructions to remand to the Board of Appeals with instructions to remand to the Planning Board for approval of the application.