2010 ME 7

**Michael ADAMS et al.**

v.

**TOWN OF BRUNSWICK et al.**

Supreme Judicial Court of Maine.

Argued: Oct. 28, 2009.

Decided: Feb. 2, 2010.

Richard L. Hornbeck, Esq., Jessica L. Maher, Esq. (orally), Moncure & Barnicle, Topsham, ME, for Michael Adams, Ernest Bevilacqua, Warren Dwyer and Patricia Welsch.

Patrick J. Scully, Esq. (orally), Shana Cook Mueller, Esq., Bernstein, Shur, Sawyer & Nelson, Portland, ME, for the Town of Brunswick.

Sandra L. Guay, Esq. (orally), Woodman Edmands Danylik & Austin, P.A., Biddeford, ME, for the Anthony and Dimitri Seretakis.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

Majority: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

Dissent: JABAR, J.

MEAD, J.

[¶ 1] Michael Adams and three other property owners in the Town of Brunswick's Residential 2 zoning district (collectively Neighbors) appeal from a judgment of the Superior Court (Cumberland County, *Warren, J.*), affirming the Brunswick Code Enforcement Officer's (CEO's) determination that leasing a house divided into two apartments to a total of eleven Bowdoin College students is an allowable use in the district. The Neighbors contend that the use creates a prohibited boarding house as defined by the Brunswick Zoning Ordinance, and is also barred as a nonconforming use by the Ordinance's lot density requirements. Because we agree with the CEO's determination that

the use constitutes an allowable two-household dwelling, not a boarding house, and because the Neighbors failed to preserve their nonconforming use argument for appeal, we affirm the judgment.

## I. BACKGROUND

[¶ 2] Dimitri and Anthony Seretakis (Owners) own a large house located at 17 Cleaveland Street in Brunswick. The house, which sits across the street from Bowdoin College, is located in the Town Residential 2(TR2) zone, and also the Village Review Overlay zone, which is designed to protect historic structures. Before the Seretakis brothers acquired it, the house was occupied by its previous owners, who rented an apartment contained within the property to two Bowdoin students each academic year.

[¶ 3] In April 2007, the Owners filed an application for a building permit to construct seven new dormers on the house and connected barn. Although not indicated on the permit application, the purpose for the dormers was to provide windows for new bedrooms the Owners were creating in the house. After the Owners received a certificate of appropriateness for constructing the dormers in the historic district, the Town issued a building permit on April 17.[1] On May 2, through "informal rumor in the community," the Neighbors learned that the Owners planned to have eleven Bowdoin students live in the house. In fact, in March 2007, the Owners had leased "Apartment A" in the house to six students for ten months beginning September 1, 2007, and had

---

1. Three of the Neighbors appealed the decision by Town staff to issue the certificate of appropriateness to the Village Review Board, which ultimately affirmed the certificate as to five of the seven dormers. The Owners appealed the VRB decision to the Superior Court, which affirmed, and then to this Court. The Owners have since dismissed their appeal, and the certificate of appropriateness is no longer at issue.

leased "Apartment B" to five students for the same time period. The leases provided that the tenants in each apartment were jointly responsible for a single monthly rent payment and for most utilities for that apartment. The only overlap in the leases for Apartments A and B was found in the division of the heating oil and propane bills, which were divided according to each apartment's square footage.

[¶ 4] Shortly after learning of the Owners' plans, the Neighbors contacted Town officials to express their concern that using 17 Cleaveland Street to house eleven students created a boarding house, which is a prohibited use in the TR2 zone. On May 30, 2007, after reviewing the leases, the CEO issued his opinion that the Owners' plan qualified as an allowable "two unit residential" use and would not create a prohibited boarding house. On the same day that the CEO released his decision, the Neighbors appealed it to the Zoning Board of Appeals (ZBA), contending that the CEO erred in finding that the planned use did not qualify as a boarding house. At a public hearing in June 2007, the ZBA affirmed the CEO's interpretation. Following another hearing in July, the ZBA denied the Neighbors' request for reconsideration.

[¶ 5] In August 2007, the Neighbors filed a complaint pursuant to M.R. Civ. P. 80B in the Superior Court, seeking to overturn the decisions of the CEO and the ZBA. Reviewing the CEO's decision directly, the court affirmed, concluding: "17 Cleaveland—which consists of a six-bed-room apartment and a five-bedroom apartment, each with separate kitchen facilities and leased as two units rather than to 11 individuals—constitutes two dwelling units rather than a boarding house." The court further concluded that, notwithstanding current lot density requirements that require a minimum one-half acre lot for two units, use of 17 Cleaveland as a two-unit dwelling on a smaller lot was grandfathered as a legal nonconforming use. This appeal followed.

## II. DISCUSSION

### A. Jurisdiction

[¶ 6] As an initial matter, the Town and the Owners challenge the subject matter jurisdiction of this Court, contending that the May 30 memorandum issued by the CEO was not appealable to the ZBA in the first instance pursuant to section 705.2 of the Ordinance.[2] The Neighbors are correct in asserting that the ZBA's jurisdiction was not challenged on this ground in proceedings before the Board or in the Superior Court; however, this Court may notice a challenge to its jurisdiction at any time. M.R.App. P. 4(d); *see Francis v. Dana–Cummings*, 2007 ME 16, ¶ 20, 915 A.2d 412, 416.

[¶ 7] Pursuant to the Brunswick Zoning Ordinance, the ZBA ordinarily has the authority "[t]o hear and decide appeals where it is alleged there is an error in any order, requirement, decision, or determination made by the Codes Enforcement Officer." Brunswick, Me., Zoning Ordinance,

2. The Owners also contend that the Neighbors' appeal from the CEO's determination concerning the proposed use is foreclosed because the Neighbors did not appeal to the ZBA within thirty days of the issuance of the building permit approving construction of the additional dormers, as required by the Ordinance. Although the Town joined in making that argument to the Superior Court, it has abandoned it in this appeal. Assuming *arguendo* that the appeal from the proposed use determination was late, the court did not err in finding that a recognized good cause exception allowed it, and we do not discuss this argument further. *See Viles v. Town of Embden*, 2006 ME 107, ¶¶ 10–12, 905 A.2d 298, 301–02.

ch. 7, § 703.1(A) (May 7, 1997). Accordingly, the CEO's May 30 determination that the Owners were not creating a boarding house was appealable unless another provision of the Ordinance barred an appeal. The Town and the Owners point to section 705.2 of the Ordinance, which affords the CEO authority that is analogous to prosecutorial discretion in certain circumstances:

> When any person files a complaint with the [CEO] that this Ordinance is being violated, the [CEO] shall examine the subject of the complaint and take appropriate action. . . . If the [CEO] declines to take action on a complaint, neither that non-action nor any written record or report on the complaint constitutes an order, requirement, decision or determination which can be appealed to the [ZBA]. Whether or not to take action on a complaint is committed to the sole and exclusive discretion of the [CEO].

Brunswick, Me., Zoning Ordinance, ch. 7, § 705.2 (May 7, 1997).

■ [¶ 8] The Town and the Owners argue that the CEO's denial of the Neighbors' complaint was final, and therefore the ZBA lacked jurisdiction to hear the Neighbors' appeal. We have said that "courts lack jurisdiction to engage in appellate review of the exercise of prosecutorial discretion by municipalities." *Salisbury v. Town of Bar Harbor*, 2002 ME 13, ¶ 10, 788 A.2d 598, 601. The ZBA's jurisdiction is a question of law, reviewed de novo, "that must be ascertained from an interpretation of municipal statutes and local ordinances." *Id.* ¶ 8, 788 A.2d at 601.

[¶ 9] For two reasons, we conclude that the ZBA did have jurisdiction to hear the appeal. First, section 705.2 of the Ordinance gives the CEO prosecutorial discretion when a complaint is filed asserting that "[the] Ordinance *is being* violated." Brunswick, Me., Zoning Ordinance, ch. 7,

§ 705.2 (emphasis added). In this case, the Neighbors believed the Ordinance *was going to be* violated. When the Neighbors contacted the CEO in May 2007, the Owners had already signed leases with the two groups of prospective student tenants, but the leases did not begin to run until September. A violation of the Ordinance, assuming that there was one, would not have occurred until the students actually took possession and thus created an illegal use. In the interim, any number of things could have happened to forestall that event.

■ [¶ 10] Second, we explained in *Salisbury* that our precedent "precludes [a] court's intrusion into municipal decision-making when a municipality decides whether or not to undertake an enforcement action." 2002 ME 13, ¶ 11, 788 A.2d at 601 (emphasis omitted). The CEO's May 30 memorandum was an advisory opinion, not a decision declining to take an enforcement action, because absent a violation occurring at that time there was nothing to enforce. The memorandum expressed the CEO's opinion concerning "the proposed use," and anticipated an appeal to the ZBA, which would presumably result in a decision affecting the CEO's future enforcement decision. Because the CEO did not exercise prosecutorial discretion but rather issued a "determination," *see* Brunswick, Me., Zoning Ordinance, ch. 7, § 703.1(A), the ZBA retained its general authority to hear the Neighbors' appeal, and this Court has jurisdiction to review the CEO's determination.

B. Construction of the Ordinance

■ [¶ 11] Because the ZBA acted only in an appellate capacity, we review the CEO's determination directly "for error of law, abuse of discretion or findings not supported by substantial evidence in the record." *Davis v. SBA Towers II, LLC*, 2009 ME 82, ¶ 10, 979 A.2d 86, 91

(quotation marks omitted); *see Mills v. Town of Eliot*, 2008 ME 134, ¶ 13, 955 A.2d 258, 263. Whether a proposed use falls within the terms of a zoning ordinance is a question of law that we review de novo. *Peregrine Developers, LLC v. Town of Orono*, 2004 ME 95, ¶ 9, 854 A.2d 216, 219. Any undefined or ambiguous terms in the Ordinance "must be construed reasonably with regard to both the objects sought to be obtained and to the general structure of the ordinance as a whole." *Davis*, 2009 ME 82, ¶ 15, 979 A.2d at 92 (quotation marks omitted). The provisions of the Ordinance "should be construed harmoniously so as not to render ineffective particular provisions." *Id.*

[¶ 12] In determining that the Owners' proposed use constituted two dwelling units and not a boarding house, the CEO began with two definitions in the Ordinance:

> **Dwelling Unit.** A group of rooms providing living quarters containing independent cooking, sleeping, and bathroom facilities for one household.
>
> . . . .
>
> **Household.** One person, or a group of two or more persons living together in the same dwelling unit as a single housekeeping entity.[3]

Brunswick, Me., Zoning Ordinance, ch. 1, § 111 (May 7, 1997).

[¶ 13] The CEO found that for each of the two apartments, the lessees were living as a "household" in a "dwelling unit" because they not only shared the same kitchen and bathroom facilities, they were also collectively responsible for fulfilling the lease, so that "[i]f one or more students were to leave during the term of the lease, then the holder of the master lease would still be responsible for the entire premises."[4] Those findings are supported by the record. Diagrams of the house show separate kitchen, bathroom, and sleeping facilities for each apartment. The Neighbors speculate that the tenants of the two apartments share the house communally through a first floor interconnecting door, but the Superior Court found no evidence that that was the case, nor is any apparent in the record. The leases establish that each tenant is responsible to the Owners for the rent for the whole apartment and most utilities, not just for his or her pro rata share. Like all households then, if one member does not do his or her share, the others suffer.

[¶ 14] As aptly put by the Superior Court:

> The [Neighbors] essentially argue that a group of unrelated students cannot constitute a household unit. The problem with this argument is that household units are not limited to family units but may involve families, extended families, unrelated individuals cohabitating together, and friends whose only relationship is that of roommate. Students are not per se excluded from the category of persons who may form household units, and the court is reluctant to adopt a definition of "household unit" that would require code enforcement officers to investigate the nature of the personal relationships that may exist among the residents of a dwelling unit.

[¶ 15] The reason for the court's reluctance is evident—to hold otherwise

---

3. The Ordinance does not define the term "housekeeping entity."

4. The first section of each lease states, "This Lease creates joint and several liability in the case of multiple Tenants." Although the copies of the leases in the record have been redacted to remove the tenants' identifying information, the CEO's May 30, 2007, memorandum states that he reviewed the unredacted leases prior to issuing his decision.

would open an inquiry into what is of no concern to the Town: are the tenants blood relatives; married; engaged; significantly committed; how committed and for how long; and if not any of those things, then why are they living together? The CEO and the ZBA recognized that the Town had no legitimate interest in the relationship between the individual tenants, because the Ordinance's definition of "household" is not restricted by relationship, but rather by living arrangement: if the group of people occupying an apartment do so as a collective enterprise in a unit providing independent kitchen, bathroom and sleeping facilities, then their occupancy qualifies as a residential use, whether they are college students or college professors.[5]

■ [¶ 16] Although the textual definitions in the Ordinance make no reference to any particular relationship that is required before two or more people may constitute a "single housekeeping entity" eligible to live in a "household," the dissent emphasizes that the Ordinance's use table lists the applicable use permitted in the TR2 zone as, "Dwelling, Single/Two Family." There was discussion at the ZBA hearing suggesting that the Ordinance's definitions of "household" and "dwelling unit" used the word "family" at one time, but the Ordinance was later amended and now refers only to persons living together

as a housekeeping entity. In written findings supporting its decision to uphold the CEO's interpretation of the Ordinance, a majority of the ZBA members found that "[t]he ordinance definitions do not refer to 'family' and could apply to an associated group of people." The ZBA discussions and findings suggest that the appearance of the word "family" in the use table is simply an outdated holdover. Even if it remains in the use table intentionally, it is abundantly clear that its inclusion in this context is intended to describe a physical structure, not the relationships of the people who live in it. The textual definitions in the Ordinance are controlling, and they do not limit either "households" or "dwelling units" to families. *See Power v. Town of Shapleigh*, 606 A.2d 1048, 1049 (Me. 1992) (stating that in construing a municipal ordinance, plain meaning of the language controls).

[¶ 17] The dissent warns that "[t]he majority's rationale opens the door for any landlord to transform a single or two-family residence into a building housing an unlimited number of unrelated and unaffiliated tenants." That dire prediction is unfounded. Although we conclude that students may not be prevented from residing at 17 Cleaveland in a living arrangement conforming to the Ordinance simply because they are students, our decision today in no way restricts the Town of

---

5. The focus of the Neighbors' concern that these tenants are college students is apparent throughout the record. For example, in their letter to the CEO leading to his May 30 determination, the Neighbors said:

> It is probably self-evident that student residential buildings ... are prohibited from residential neighborhoods because they tend to have characteristics that are not compatible with a quiet, historic neighborhood such as our TR2 District. Student activities, parties, noise, hours, traffic and relative lack of concern for neighborhood maintenance and cleanliness are disturbing

to neighbors and damaging to their property values.

Setting aside the fact that the Neighbors did not know whether their concerns about college students in general were warranted concerning these students in particular, a generalization about any group cannot justify disparate application of the Ordinance. If it wished, the Town could restrict the number of people who may live in an apartment of a given size just as it has restricted occupancy based on living arrangement, but it has not done so, and it cannot selectively do so based on who those people are.

Brunswick's prerogative to regulate occupancy based on current or future density requirements, fire and safety codes, or other municipal regulations affecting the number of residents who may occupy a residential building.

■ [¶ 18] After considering whether the Owners' proposed use qualified as a residential use, the CEO also examined whether it created a prohibited boarding house as defined by the Ordinance:

> **Boarding House.** A building other than a hotel containing a shared kitchen and/or dining room, with sleeping rooms accommodating no more than two persons per room (excepting minor children) which are offered for rent, with or without meals. Includes a college fraternity or sorority.

Brunswick, Me., Zoning Ordinance, ch. 1, § 111.

[¶ 19] The CEO's May 30 memorandum concluded that the use did not constitute a boarding house because "in the case of a Boarding House the rent is for individual rooms, not the entire premises, with each tenant being responsible for the rent of their own room only." We agree with this analysis. As discussed earlier, the tenants here qualify as a household because their tenancy is a shared endeavor. If one tenant fails to pay his share, the others are still responsible for the entire rent. Conversely, in the common understanding of a boarding house, if one boarder does not pay he may be evicted with no impact on other boarders. A household is a collective enterprise; a boarding house is an individual one.

[¶ 20] The Ordinance's definition of "boarding house" also supports the CEO's conclusion. It begins with the phrase "[a] building other than a hotel," suggesting that a boarding house is in the same general category as a hotel, which certainly imposes only an individual obligation. It is immaterial to a hotel guest how many other guests there are, or when they come and go.

[¶ 21] The definition ends with the sentence, "Includes a college fraternity or sorority." In their brief, the Neighbors argue that "[s]ince a fraternity is included in the definition of a boarding house, a house such as 17 Cleaveland that is filled with students . . . cannot reasonably be considered anything other than a boarding house." However, there are two ways to analyze the "[i]ncludes a college fraternity" provision that both lead to a contrary conclusion. First, if a fraternity already meets the definition of a boarding house, then there is no reason to single it out for inclusion. Under this analysis, the Ordinance does not include a fraternity as an example of a boarding house; rather it recognizes that a fraternity would not qualify as a boarding house absent special language including it. Such a specific provision could not be read to encompass all living situations that happen to involve students, as the Neighbors would urge.

[¶ 22] Second, if the definition was intended to include a fraternity as an example of a boarding house, that inclusion serves to further illustrate the difference between a boarding house and the occupancy of 17 Cleaveland by these two groups of tenants who happen to be students. A fraternity has a lasting purpose independent of its current residents—students are admitted to and expelled from it, they may quit, drop out of school or graduate, but the fraternity remains. Its membership changes, but it is always populated by students, and its mission and existence are unaffected by who the current members are. Like a boarding house, then, the departure of one has little impact on the living arrangements of the others. Conversely, 17 Cleaveland happens to be

leased to two groups of students now, but that may not always be the case. After the leases expire, the Owners may occupy it themselves, sell it, or rent to non-students. The surface similarity to a fraternity exists only because students are the current tenants. Accordingly, the inclusion of a fraternity in the definition of a boarding house is immaterial to the question of whether 17 Cleaveland also constitutes a boarding house.

[¶ 23] We considered a similar argument in *Peregrine Developers, LLC*, 2004 ME 95, 854 A.2d 216, a case that is not controlling here but is nonetheless instructive. There the issue was whether a large housing complex marketed to University of Maine students qualified under the ordinance as an allowable "multifamily dwelling planned unit development," or as a prohibited "dormitory." *Id.* ¶ 3, 854 A.2d at 218. The developers sought to prevent their proposal from being classified as a dormitory by having a separate lease for each unit, which in turn would have its own kitchen, living room, bathroom, and bedrooms. *Id.* ¶¶ 2–3, 854 A.2d at 218.

[¶ 24] In rejecting an argument much like that advanced by the Neighbors, we noted that one party "would have us conflate ... terms so as to transform the meaning of multifamily dwelling into a dormitory if enough students live there." *Id.* ¶ 15, 854 A.2d at 221. In language adaptable to this case, we held:

> [T]here is no indication in the Ordinance that a "dormitory" is a structure defined by the types of individuals who would reside in the structure. The Town ... may not deny applications for development by using a more restrictive standard for regulation than is contained in its Ordinance.

*Id.* ¶ 19, 854 A.2d at 221.

[¶ 25] As in Peregrine Developers, the Brunswick Ordinance does not define a dwelling unit or a boarding house by the types of individuals who live there, and the Neighbors cannot force the Town to apply a more restrictive regulatory standard than is contained in its Ordinance. *Cf. Spain v. City of Brewer*, 474 A.2d 496, 500 (Me.1984) (stating that government agency cannot deny permits "on grounds other than those specified by ... local ordinance," and "where the applicant has demonstrated compliance with all the statutory criteria, the municipal officers must issue the permit"). The Neighbors argue that the Owners are somehow taking unfair advantage of the Town's zoning scheme by structuring their leases to put students into residential areas where they should not be. The fatal flaw in that assertion is that if the leases comply with the requirements of the Ordinance, then the Owners are not abusing the system but rather operating within it, and consequently their student tenants have an opportunity to live in the TR2 zone equal to that of the Neighbors.

[¶ 26] Because the CEO's determination that the Ordinance does not bar the Owners from leasing two apartments at 17 Cleaveland to two groups of students is supported by substantial evidence in the record, and reveals no error of law or abuse of discretion, it is affirmed.

C. Nonconforming Use

■ [¶ 27] Finally, the Neighbors contend that the division of 17 Cleaveland into two apartments violates the Ordinance's current lot density requirements and is not a lawful nonconforming use, notwithstanding the historical use of the property as an owner-occupied residence with an accessory apartment. Neither the Neighbors' May 24, 2007, letter to the CEO requesting that he make a determination on the boarding house issue, their attorney's cease and desist letter to the

Owners of the same date, nor the CEO's decision six days later mentions this argument. Accordingly, it is not preserved for appellate review, and we decline to consider it.[6] *See State v. Dominique,* 2008 ME 180, ¶ 25, 960 A.2d 1160, 1166 ("Arguments which are not preserved for appeal are not properly before the Court.").

The entry is:

Judgment affirmed.

JABAR, J., dissenting.

[¶ 28] I respectfully dissent for two reasons. First, in my view, the majority relies too heavily on the financial arrangement between the Owners and the tenants, rather than focusing on the use of the premises. Second, I believe that the majority wrongly analyzes whether 17 Cleaveland constitutes a "two dwelling unit," rather than a "Dwelling, Single/Two Family," which is the operative language of the Brunswick Zoning Ordinance. *See* Brunswick, Me., Zoning Ordinance, ch. 2, § 202.1 (May 7, 1997).

[¶ 29] By narrowly focusing on the terms of the lease agreement, the majority's analysis elevates form over substance. Consistent with the Ordinance, we should be focusing on the use of the property. The financial agreement between the Owners and the tenants does not define the use of the premises. Simply because the tenants are collectively responsible for rent payments does not mean that the building in question is not a boarding house.

[¶ 30] In actuality, the use of the building is closer to constituting a "boarding house" than a "Dwelling, Single/Two Family." The Ordinance defines "boarding house" as "[a] building other than a hotel containing a shared kitchen and/or dining room, with sleeping rooms accommodating no more than two persons per room (excepting minor children) which are offered for rent, with or without meals. Includes a college fraternity or sorority." Brunswick, Me., Zoning Ordinance, ch. 1, § 111 (May 7, 1997). Seventeen Cleaveland, which is divided into two apartments, has eleven bedrooms and is offered for rent to eleven students. There are shared kitchens in each apartment. Moreover, although the majority emphasizes that rent payments are made collectively, rather than individually, the definition of "boarding house" includes "a college fraternity or sorority." Even putting aside the "surface similarity" that 17 Cleaveland houses students, a fraternity or sorority could be an example where rent is paid collectively, rather than individually. By requiring that rent be paid individually to fit the definition of a "boarding house," the majority is reading in a requirement not present in the Ordinance.

[¶ 31] Carried to its logical conclusion, the majority's rationale means that, subject to other restrictions in the Ordinance, there is no limit to the number of occupants who could live at 17 Cleaveland. As long as the lease agreement is structured so that rent is paid collectively, rather than individually, 17 Cleaveland is not a boarding house.

[¶ 32] This analysis flies in the face of common sense and ignores the language and intent of the Ordinance. Two specific purposes of the Ordinance are to:

1. Establish Growth and Rural areas and encourage use consistent with the character of each such area.

. . . .

---

**6.** The Neighbors did make their nonconforming use argument to the ZBA and the Superior Court. Nevertheless, because this issue was not raised initially with the CEO, and it is the CEO's May 30, 2007, determination that we review directly in this case, it was not preserved.

7. Encourage orderly and effective development that is compatible with Brunswick's historic development patterns, unique character, and its established neighborhoods.

Brunswick, Me., Zoning Ordinance, ch. 1, § 104 (May 7, 1997). Allowing a "Single/Two Family" dwelling unit in the TR2 zone to be converted into a two-unit building with eleven bedrooms—with the potential to house an unlimited number of unrelated occupants—violates the specific purposes of the Ordinance, as well as the spirit of the Ordinance. *Cf. Stewart v. Town of Sedgwick*, 2002 ME 81, ¶ 6, 797 A.2d 27, 29 (stating that terms in an ordinance should be construed "reasonably in light of the purposes and objectives of the ordinance"). The majority's rationale opens the door for any landlord to transform a single or two-family residence into a building housing an unlimited number of unrelated and unaffiliated tenants. This type of development is not compatible with the unique character of the TR2 and Village Review Overlay zones.

[¶ 33] I also dissent because, unlike the majority, I believe that the proper inquiry should be whether 17 Cleaveland constitutes a "Dwelling, Single/Two Family." The Ordinance's use table, which lists the types of uses permitted, allows for a "Dwelling, Single/Two Family." Brunswick, Me., Zoning Ordinance, ch. 2, § 202.1. "Dwelling, Single/Two Family" is the specific type of permitted use applicable to this case. Our task, then, should be to interpret the meaning of this provision, which is an effort undertaken de novo. *See JPP, LLC v. Town of Gouldsboro*, 2008 ME 194, ¶ 8, 961 A.2d 1103, 1105.

[¶ 34] The CEO interpreted "Dwelling, Single/Two Family" as permitting a single residential structure with two dwelling units, each containing one household. The CEO never accounted for the term "family," even though it is part of the language defining the type of permitted use. The ZBA agreed with the CEO, noting that the Ordinance definitions "do not refer to 'family' and could apply to an associated group of people." On appeal, the Superior Court followed the same reasoning and ignored the term "family." Although it acknowledged that the specific type of permitted use applicable to this case is "Dwelling, Single/Two Family," the court stated in footnote five of its decision:

> [B]ecause the ordinance definition of dwelling unit refers to households, not families, the court concludes that there is no requirement that a household constitute a family. A contrary conclusion would open up the very difficult question of what constitutes a family and whether unrelated persons cohabitating together or living as roommates would be excluded from that definition.

The majority has adopted this same approach, again ignoring the term "family" in its analysis.[7] This runs counter to the rules of statutory construction, which "require zoning ordinances and subdivision standards to be interpreted so as [not] to render a provision a surplusage." *Bodack v. Town of Ogunquit*, 2006 ME 127, ¶ 12, 909 A.2d 620, 624 (quotation marks omitted) (alteration in original).

[¶ 35] That it may be difficult to define what constitutes a "family" in our modern and diverse world does not mean we should avoid the issue. Although the word "family" is not defined in the Ordinance,

---

**7.** Although the majority characterizes the term "family" as an "outdated holder," it should be noted that the term "family" is used elsewhere in the ordinance. *See* Brunswick, Me., Zoning Ordinance, ch. 3, § 306.1 (May 7, 1997) (referencing "Two–Family Dwellings" and "Multi–Family Dwellings").

undefined terms should be given their generally accepted meaning. *See Jade Realty Corp. v. Town of Eliot*, 2008 ME 80, ¶ 7, 946 A.2d 408, 411 ("An interpreting court should give terms not otherwise defined their common and generally accepted meaning unless indicated otherwise by their context in the ordinance." (quotation marks omitted)).

[¶ 36] Black's Law Dictionary defines "family" as: "**1.** A group consisting of parents and their children.—Also termed *immediate family.* **2.** A group of persons connected by blood, by affinity, or by law. **3.** A group of persons, usu. relatives, who live together." Black's Law Dictionary 620 (7th ed.1999). Whatever hypothetical difficulty may be encountered in defining the precise contours of the term "family," in this case the eleven unaffiliated and unrelated occupants living in the eleven bedrooms in the two apartments at 17 Cleaveland plainly do not constitute two families by any definition. The proposed use of 17 Cleaveland does not constitute a "Dwelling, Single/Two Family," and does not fall within the other applicable permitted uses listed in the Ordinance's use table.

[¶ 37] In conclusion, I believe that the majority wrongly ignores the term "family," and disproportionately relies upon the lease agreement, rather than the use of the building, which violates the specific purposes set forth in the Ordinance. For these reasons, I would vacate the Superior Court's judgment, and respectfully dissent from the Court's opinion.