STATE OF MAINE                                          SUPERIOR COURT
CUMBERLAND, ss.                          STATE OF MAINE CIVIL ACTION
                                    Cumberland, SS, Clerk's Office
                                                         DOCKET NO: AP-10-044
                                          APR 28 2011    RAC - CUM - 4/28/201

                                          RECEIVED


KATHLEEN KURLANSKI and
ZBIGNIEW KURLANSKI,

                    Plaintiffs,

                                                       ORDER ON
          v.                                      MOTION TO DISMISS

TOWN OF FALMOUTH et al.

                    Defendants



          Kathleen and Zbigniew Kurlanski appeal from a decision of the Town of

Falmouth's Zoning Board of Appeals finding the Portland Yacht Club may park

cars on a grass lot adjacent to the Kurlanskis' property. The Kurlanskis have also

filed independent claims for breach of contract and promissory estoppel. The

Portland Yacht Club and the Town of Falmouth now move to dismiss these

independent claims.

                              BACKGROUND

          The Kurlanskis allege the following. The Portland Yacht Club is a private

club in Falmouth, Maine. (Compl. ¶¶ 5, 7.) On June 10, 1983 the Club purchased

an unimproved parcel of property abutting its premises. (Compl. ¶¶ 16–17, 19,

22.) This parcel is identified as Lot 2. (Compl. ¶ 16.) On December 16, 1983, the

Kurlanskis purchased an adjacent property identified as Lot 1, on which they

currently reside. (Compl. ¶¶ 2, 20–21.)

                                      1

On September 12, 1999, the Kurlanskis submitted a letter to the Falmouth Code Enforcement Officer (CEO) complaining that the Club had regularly used Lot 2 for parking motor vehicles during the summer of 1999, in alleged violation of the Falmouth zoning ordinance.[1] (Compl. ¶ 29.) On October 19, 1999, the CEO ordered the Club to stop parking cars on Lot 2 in violation of the ordinance prohibiting the establishment of a parking area without approval from the Falmouth Planning Board. (Compl. ¶ 36.)

The Club did not appeal the CEO's decision. (Compl. ¶ 38.) However, on November 24, 1999 the Club wrote the CEO to request that he reconsider the matter. (Compl. ¶ 39.) In the letter, the Club reasserted its claim that the Falmouth Planning Board had already approved the use of Lot 2 for parking in a parallel proceeding.[2] (Compl. ¶¶ 39–40.) Finally, the Club indicated that it would be willing to accommodate the Kurlanskis and requested a meeting to discuss acceptable parking restrictions that would not run afoul of the ordinance. (Compl. ¶ 42; Amended Compl. ¶ 117.)

In letters dated May 22, 2000, and June 19, 2000, the Club wrote the CEO to request written confirmation that special event parking on Lot 2 would be acceptable pursuant to an agreement reached at a meeting between the Club, the CEO, and another town official. (Amended Compl. ¶¶ 120–22.) The Kurlanskis also played some role in these discussions. (Compl. 44.) The Club agreed to limit its use of Lot 2 for overflow parking to three events per year, which would

---

[1] The parties have not placed the zoning ordinance in the record, and courts "do not take judicial notice of ordinances." *Mills v. Town of Eliot*, 2008 ME 134, ¶ 23, 955 A.2d 258, 266.
[2] The Club was also pursuing permits to build a boathouse and make other changes at this time. Those proceedings are not relevant to the pending motions.

constitute allowable incidental use.[3] (Stearns Aff. Ex. 1.) However, the Club also stated that it was actively investigating the past use of Lot 2, and would attempt to establish that parking was allowed as a grandfathered use. (Stearns Aff. Ex. 1.) The letter closed with the following: "This request is not intended as a waiver of any rights that the Club may have to continue the use of [Lot 2] as a grandfathered nonconforming use." (Stearns Aff. Ex. 1.)

The CEO responded by affirming that the use of Lot 2 for parking on no more than three specific events during the summer would constitute occasional use that would not be a zoning violation. (Compl. ¶ 46.) In a letter dated August 18, 2000, the CEO informed the Kurlanskis that the Club would park cars on Lot 2 during three events per year. (Compl. ¶ 47.)

Parking on Lot 2 was limited to three events per year from 2000 through 2006. (Compl. ¶ 52.) In 2007, the Kurlanskis' daughter reported that motor vehicles were parking on Lot 2 more frequently. (Compl. ¶ 54.) The Kurlanskis contacted the Club, which told them that it intended to use Lot 2 for parking more frequently in the future. (Compl. ¶ 55.) On April 2, 2009, the Kurlanskis sent the Town's new CEO a formal complaint alleging that the Club had violated the Town's ordinance by allowing vehicles to regularly park on Lot 2 and by depositing crushed rock onto the grass at the boundary of Lot 2. (Compl. ¶ 59.)

On August 6, 2009, the new CEO found that there was no violation because intermittent seasonal use for parking had been established on the property prior to the adoption of zoning in 1965. (Compl. ¶ 61.) The Kurlanskis appealed the CEO's decision to the Falmouth Zoning Board of Appeals (ZBA).

---

[3] The letters form the written evidence of the alleged contract, so may be considered on a motion to dismiss without converting the motion into one for summary judgment. *Moody v. State Liquor & Lottery Comm'n*, 2004 ME 20, ¶ 12, 843 A.2d 43, 48.

(Compl. ¶ 65.) At a hearing on April 20, 2010, the ZBA ruled that it had jurisdiction to hear the appeal over the Kurlanskis' objection. (Compl. ¶ 66.)

A special hearing was then held on July 20, 2010, at which the ZBA conducted a de novo inquiry into whether the use of Lot 2 was a grandfathered nonconforming use. (Compl. 74.) The new CEO was on a leave of absence and was not available to defend his decision, but a deputy CEO was present to assist the ZBA. (Compl. ¶¶ 70, 74.) The ZBA heard statements from various individuals, and received from the Kurlanskis an affidavit from Lot 2's prior owner. (Compl. ¶ 75.) The ZBA discussed this evidence at its regular meeting on July 27, 2010, took a preliminary vote on the matter, and instructed its attorney to draft findings of fact and conclusions of law. (Compl. ¶¶ 76–77.) Finally, on October 26, 2010, the ZBA adopted findings of fact showing that Lot 2 was a grandfathered, nonconforming use that could be used for parking during four to eight events per season. (Compl. ¶ 79.)

The Kurlanskis filed their Rule 80B appeal and complaint on December 7, 2010, claiming among other things that the communications between Town, the Club, and the Kurlanskis in the year 2000 formed a contract. This alleged contract bound the Club to use Lot 2 for parking no more than three times per year, and bound the Town to prevent all parking on the Lot if the Club exceeded the three-event limit. The Kurlanskis later amended their complaint to add a claim for promissory estoppel. The Town and Club move to dismiss these independent claims.

## DISCUSSION

"A motion to dismiss tests the legal sufficiency of the complaint." *Heber v. Lucerne-in-Maine Village Corp.*, 2000 ME 137, ¶ 7, 755 A.2d 1064, 1066 (quoting

4

*McAfee v. Cole*, 637 A.2d 463, 465 (Me. 1994)). "For purposes of a 12(b)(6) motion, the material allegations of the complaint must be taken as admitted." *McAfee*, 637 A.2d at 465. The Court examines "the complaint 'in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory.'" *Johanson v. Dunnington*, 2001 ME 169, ¶ 5, 785 A.2d 1244, 1245–46 (quoting *In re Wage Payment Litig. v. Wal-Mart Stores, Inc.*, 2000 ME 162, ¶ 3, 759 A.2d 217, 220).

"Generally, 'the existence of a contract is a question of fact to be determined by the jury.'" *Sullivan v. Porter*, 2004 ME 134, ¶ 13, 861 A.2d 625, 631 (quoting *June Roberts Agency, Inc. v. Venture Props., Inc.*, 676 A.2d 46, 48 (Me. 1996)) (quotations omitted). However, in order for a contract to exist, a jury must be able to find that "the parties mutually assent[ed] to be bound by all its material terms, the assent is either expressly or impliedly manifested in the contract, and the contract is sufficiently definite to enable the court to ascertain its exact meaning and fix exactly the legal liabilities of each party." *Id.* (citing *Forrest Assocs. v. Passamaquoddy Tribe*, 2000 ME 195, ¶ 9, 760 A.2d 1041, 1044). Furthermore, the contract must be legal, *Lehigh v. Pittston Co.*, 456 A.2d 355, 361 (Me. 1983), and there must be consideration. *Laflamme v. Hoffman*, 148 Me. 444, 450, 95 A.2d 802, 805 (1953).

While it is clear that the parties did reach some form of agreement, the question is whether their mutual understanding could have created a legally binding contract. The answer is no. Giving the Kurlanskis the benefit of all reasonable inferences, the court could assume for the purpose of these motions that the attorney representing the Club had authority to bind the Club to a

5

contract. The CEO, however, could not have had legal authority to enter into a contract on behalf of the Town.

The executive and administrative authority of a town is generally vested in the board of selectmen, acting as a body. *Sirois v. Frenchville*, 441 A.2d 291, 294 (Me. 1982) (quoting 30 M.R.S.A. § 2316 (1978) (current version at 30-A M.R.S. § 2635 (2010))). A municipality's code enforcement officer, in contrast, has limited authority defined by statute. *See id.* (discussing the limited authority of selectman acting alone). This authority does not allow the officer to enter contracts on the town's behalf. *See* 30-A M.R.S. §§ 4451–52 (2000). "All persons contracting with town or city officers must take notice at their peril of the extent of the authority of such officers. It is not the town's burden to establish the absence of authority, but the plaintiff's burden to prove the authority." *Sirois*, 441 A.2d at 294.

The Kurlanskis have not alleged any basis from which they might prove that the Town's CEO had the authority to bind the Town to the alleged contract. A jury would have to speculate that the CEO's action had been authorized or ratified at some unidentified meeting of the Board of Selectmen. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (pleading must allege more than speculative grounds for relief in order to avoid dismissal). The Kurlanskis have thus failed to allege a prima facie case for breach of contract against the Town.

Even assuming that all parties were represented by agents with adequate authority, the alleged contract must fail for lack of mutual assent to be bound and a related want of consideration. Confusion on this point appears to stem from the terms of the alleged agreement reached in 2000. The Kurlanskis allege that the CEO found that the Club's use of Lot 2 up to that point had violated the ordinance. However, the CEO also determined that parking cars on Lot 2 for no

more than three events per year would be occasional use not violating the ordinance. The Club declared that it would conform its use of the Lot to meet the CEO's interpretation of the ordinance, but expressly reserved its right to challenge the CEO's interpretation in the future if and when it gained more information regarding Lot 2's history.

It is clear from the above that the Club did not assent to be bound or offer any other form of consideration. The Club only agreed to conform its behavior to what the CEO interpreted the law to demand. Performance of an existing legal obligation, in this case by refraining to use the Lot for general parking, cannot serve as consideration for a reciprocal promise in a contract. *Panasonic Commc'ns & Sys. Co. v. Dept. of Admin*, 1997 ME 43, ¶ 14, 691 A.2d 190, 195 (citing Restatement (Second) of Contracts § 73 (1981)). Even this promise was illusory, because the Club also expressly reserved its right to challenge the CEO's interpretation of the ordinance or develop new evidence that would change how the ordinance applied. Ultimately, the Club only agreed to comply with the CEO's interpretation of the law until it felt like it didn't have to. This is not a promise.

Similarly, the CEO did not promise to refrain from enforcing the ordinance.[4] Assuming that he could have made such a promise, all the CEO did was interpret the ordinance as allowing occasional use of the Lot for parking. In the CEO's opinion, using Lot 2 for overflow parking on no more than three events per summer would fall short of establishing a parking area without prior approval, and thus not violate the ordinance. So long as the Club did not attempt

---

[4] The court cannot ascertain the limits of the CEO's prosecutorial discretion without reference to the Town of Falmouth's ordinance. *See Adams v. Town of Brunswick*, 2010 ME 7, ¶¶ 8–9, 987 A.2d 502, 506.

to use the Lot more frequently and thereby establish a parking area, there would be no violation and the CEO could not initiate an enforcement action.

As alleged in the complaint, the supposed promise to not enforce the order of October 19, 1999 was really nothing more than a promise not to bring an enforcement action so long as there was no violation. Like the Club's promise to obey the law, the CEO's promise to enforce the law only when there was a violation cannot constitute consideration for a contract.

Finally, the Kurlanskis allege that they agreed to refrain from filing a complaint with the CEO or seeking relief in the nature of a writ of mandamus so long as the Club limited its use of Lot 2 to three events per year. Only the Town could actually initiate an enforcement action, so the Kurlanskis really promised to refrain from two actions. *Herrle v. Town of Waterboro*, 2001 ME 1, ¶ 11, 763 A.2d 1159, 1162 (citing 30-A M.R.S. § 4452(4)).

First, the Kurlanskis promised not to bring an action as abutters to compel the CEO to enforce the October 19, 1999 order, assuming that they could do so under the ordinance. The problem here is that the order of October 19, 1999 was issued in response to the Club's supposed attempt to establish a parking area. So long as the Club did not regularly park cars on the Lot, there would be no violation to enforce the order against, so the promise was empty. The Kurlanskis' second promise was to refrain from challenging the CEO's determination that parking on Lot 2 during three events per year would not violate the ordinance, again assuming they could do so. This may conceivably have constituted legal consideration, but it would have been non-mutual and therefore insufficient to bind the other parties to a contract.

The illusory nature of the alleged contract in this case becomes clear if the court tries "ascertain its exact meaning and fix exactly the legal liabilities of each party." *Sullivan*, 2004 ME 134, ¶ 13, 861 A.2d at 631. If the Club were to "breach" the agreement by parking motor vehicles on the Lot more than three times per year, the Kurlanskis would be free to file a complaint with the Town CEO against the alleged breach of the ordinance. The CEO would then determine whether the Club's increased use violated the ordinance, and be free to initiate an enforcement action if the law was being violated. Either the Kurlanskis or the Club could appeal the CEO's decision to the ZBA. This is exactly what would happen in the ordinary course without the alleged contract, and is exactly what happened in this case.

Giving the Kurlanskis the benefit of all reasonable inferences, they have failed to allege facts that could prove the existence of the alleged contract between the parties. Their Count VI for breach of contract is dismissed.

In addition to their contract claim, the Kurlanskis contend that the defendants are bound by their alleged promises through the doctrine of estoppel. Maine has adopted the Restatement definition of promissory estoppel, which states:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Harvey v. Dow*, 2008 ME 192, ¶ 11, 962 A.2d 322, 325 (quoting Restatement (Second) of Contracts § 90(1) (1981)). The Kurlanskis argue that the Club promised them and the CEO that it would limit its use of Lot 2, and that the CEO promised to refrain from enforcing the October 19, 1999 order so long as the use

9

was so limited. The Kurlanskis, reasonably relying on these promises, refrained from seeking enforcement of their complaint and the October 19, 1999 order.

The promissory estoppel claim suffers from many of the same deficiencies as the contract claim. Assuming that the Kurlanskis reasonably believed the defendants' statements were directed at them, the only written evidence of the Club's alleged promise shows that it expressly reserved the right to increase its use of Lot 2 for parking in the future. This is not a promise, and it would be unreasonable to view it as such. Similarly, the CEO merely interpreted the ordinance and promised to enforce its terms. The Kurlanskis could not reasonably have read anything extraordinary into this statement from a town official.

The Kurlanskis have also not alleged that they materially changed their legal position in reliance on the defendants' alleged promises. Here it is important to note that private citizens cannot enforce an ordinance. *Herrle*, 2001 ME 1, ¶ 11, 763 A.2d at 1162. The Kurlanskis could have filed a new complaint if they felt the Club was at any time using Lot 2 in violation of the ordinance, or they could have sought mandamus to compel action on the CEO's prior order if they felt it was not being enforced. *See Ray v. Town of Camden*, 533 A.2d 912, 913–14 (Me. 1987). "[M]andamus can only overcome a failure to act and set the deliberative process in motion, assuming the applicant is entitled to have the process performed." *Id.* at 914. It cannot guaranty an outcome.

While the Kurlanskis did refrain from taking the above actions while the Club limited overflow parking on Lot 2 to three events per year, they initiated this current complaint as soon as the Club began to use the Lot more extensively. They have not alleged any undue prejudice arising from this delay, nor have

10

they shown any injustice resulting from the seven-year détente between the parties. The Kurlanskis have not alleged a viable claim for promissory estoppel, and their Count VII is dismissed.

**The entry is:**

The Portland Yacht Club's motion to dismiss Counts VI and VII is granted.

The Town of Falmouth's motion to dismiss Counts VI and VII is granted.

DATE: _April 25, 2011_

Roland A. Cole
Justice, Superior Court

11

Date Filed __12-07-10__ __Cumberland__ Docket No. __AP-10-44__

County

Action __80B Appeal__

KATHLEEN KURLANSKI                    TOWN OF FALMOUTH
ZBIGNIEW J. KURLANSKI                 THE PORTLAND YACHT CLUB

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| | AARON BURNS ESQ (TOWN OF FALMOUTH) |
| ZBIGNIEW J. KURLANSKI, ESQ.<br>PO BOX 46<br>PORTLAND, ME 04112 | DAVID LOURIE ESQ (PORTLAND YACHT CLUB) |
| PETER M. MCGEE, ESQ. | |

| Date of Entry | 80 EXCHANGE STREET<br>PORTLAND, ME 04101 | |
|---|---|---|
| 2010 | | |

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO: AP-10-044
RAC-CUM-5/9/2012

KATHLEEN KURLANSKI

and

ZBIGNIEW KURLANSKI

STATE OF MAINE
Cumberland,ss,Clerk's Office

MAY 0 9 2012

**RECEIVED**

Plaintiffs,

v.

**ORDER**

TOWN OF FALMOUTH

and

PORTLAND YACHT CLUB

Defendants.

Kathleen and Zbigniew Kurlanski's Rule 80B appeal of the Town of Falmouth Board of

Zoning Appeal's decision is before the court.

## BACKGROUND

### 1. Factual Background

Prior to 1965, the Portland Yacht Club (PYC) purchased property located on the

shore of Casco Bay in Falmouth, Maine. Part of this property was paved and used as a

parking area for its members and guests. In the early 1960s, Clifton and Albertina

Bryant owned two lots and used them for residential purposes. They had a house on

lot 1. Lot 2, which abutted lot 1 and PYC's parking area, contained a pond and grassy

area. On June 10, 1983, PYC purchased lot 2.

The parties presented contradicting regarding the use of the property while the

Bryants owned lot 2, however, several members of PYC recall lot 2 being used for

1

occasional overflow parking prior to 1983. On December 16, 1983, Kathleen and Zbigniew Kurlanski (the Kurlanskis) purchased lot 1 and use it as their primary residence. PYC continues to own lot 2.

## 2. Procedural Background

In 1998 or 1999 PYC submitted an application regarding the construction of a boathouse on its existing paved parking area. (R. 278.) In the application, PYC claimed "that it could utilize open space that it purchased in 1983 from the Bryant estate for overflow parking in the event that the paved parking lot had reached its capacity for parking motor vehicles." (Pet.'s Br. 3.) The Falmouth Planning Board approved the application and the Kurlanskis appealed the approval to the Superior Court and then to the Law Court. (R. 286, 255.) The Law Court remanded the decision "for site plan review as required by the applicable ordinance." (R. 255.)

On September 12, 1999, the Kurlanskis filed a complaint with the Town of Falmouth Code Enforcement Officer (CEO) regarding PYC's use of lot 2 for overflow parking. (R. 228.) After hearing from PYC's attorney, the CEO issued a decision asking PYC to "cease parking on the lawn area in question." (R. 231.) The letter also stated, "You also have the right to appeal this decision to the Zoning Board of Appeals." (R. 232.) After receiving this decision, PYC did not appeal the decision. Instead, it "agree[d] to limit its use of the Field for overflow parking to three (3) events representing incidental use of the Field." (R. 233.) The CEO approved that plan, but encouraged PYC to formalize the plan through the planning board. (R. 235.) Although the planning board never considered the agreement, it was followed without issue through 2006.

In 2007 the use of the lot increased while the Kurlanskis were out of the country. In 2008, after the Kurlanskis returned home, they met with the new CEO. On April 2,

2

2009, the Kurlanskis sent a formal letter to the CEO complaining about the excessive use of the lot for overflow parking. (R. 28.) The CEO responded on August 6, 2009, stating that the use of the lot as overflow parking is a permissible non-conforming use. (R. 52.)

The Kurlanskis appealed the decision. On April 27, 2010, the Town of Falmouth Board of Zoning Appeal (the Board) determined that it had jurisdiction to hear the appeal. At the July 20, 2010, hearing the Kurlanskis learned that the new CEO was on a leave of absence and would not be able to testify. A de novo hearing took place. On October 26, 2010, the Board determined that "[o]verflow parking on lot 2 is grandfathered up to 8 events per year." (R. 11.) The Kurlanskis filed a motion for reconsideration, which was denied. On December 7, 2010, the Kurlanskis filed a Rule 80B complaint with the Superior Court. This court dismissed Counts VI and VII on April 28, 2011. Additionally, the court denied the Kurlanskis' motion for a trial on the facts on August 17, 2011.

## DISCUSSION

### 1. Standard of Review

When reviewing governmental action under M.R. Civ. P. 80B, the Superior Court reviews the operative decision of the municipality for "abuse of discretion, errors of law, or findings not supported by the substantial evidence in the record." *Camp v. Town of Shapleigh*, 2008 ME 53, ¶ 9, 943 A.2d 595 (quoting *McGhie v. Town of Cutler*, 2002 ME 62, ¶ 5, 793 A.2d 504). "Substantial evidence is evidence that a reasonable mind would accept as sufficient to support a conclusion." *Toomey v. Town of Frye Island*, 2008 ME 44, ¶ 12, 943 A.2d 563 (quoting *Sproul v. Town of Boothbay Harbor*, 2000 ME 30, ¶ 8, 746 A.2d 368). "That inconsistent conclusions can be drawn from evidence does not mean that a finding is not supported by substantial evidence." *Id.*

3

## 2. Rule 80B Appeal

The Kurlanskis dispute the Board's findings on three grounds. First, they argue that PYC is precluded from disputing the CEO's decision from October 1999. Second, they argue that the Board violated the town ordinance by conducting the hearing de novo. Third, they argue that PYC's use of lot 2 as a parking area is not a nonconforming use and, therefore, is in violation of the zoning ordinance. After reviewing these three arguments, the court upholds the Board's determination.

### a. Preclusion

The Kurlanskis argue that PYC is precluded from disputing the CEO's decision from October 1999, but PYC argues that the 1999 decision did not provide proper notice to constitute preclusion. "The doctrine of res judicata prevents 'the relitigation of claims that were tried or could have been tried between the same parties or their privies . . . in an earlier suit on the same cause of action.' An administrative proceeding that includes the essential elements of adjudication is given the same preclusive effect as an adjudication in court." *Town of Boothbay v. Jenness*, 2003 ME 50, ¶ 20, 822 A.2d 1169 (quoting *Town of Ogunquit v. Cliff House & Motels, Inc.*, 2000 ME 169, ¶¶ 10, 11, 759 A.2d 731).

"[A]dequate notice of the proceeding and of the risk of failing to appear are 'essential elements' for preclusion." *Jenness*, 2003 ME 50, ¶ 21, 822 A.2d 1169. In order to constitute adequate notice, a "CEO's order must, at a minimum, contain" notice informing the violator of a right to appeal, how to appeal, and the consequences of the failure to appeal. *Id.* at ¶ 22 (citing *Town of Freeport v. Greenlaw*, 602 A.2d 1156, 1161 (Me. 1992)). The October 1999 CEO decision did not specify the consequences of a failure to appeal, and therefore its outcome is not subject to preclusion.

4

### b. De Novo Hearing

The Kurlanskis assert that the Board violated the Town's ordinance when it conducted the hearing de novo, instead of conducting a legal review based on the CEO's findings. (Pet.'s Br. 19.) The Kurlanskis have waived this argument, however, since they did not raise it before the Board.[1]

"[A] party in an administrative proceeding must raise any objections it has before the agency to ensure that the agency, and not the court, has the first opportunity to pass upon the claims of the parties." *Oliver v. City of Rockland*, 1998 ME 88, ¶ 7, 710 A.2d 905. "An issue is considered raised and preserved for appeal 'if there is sufficient basis in the record to alert the court and any opposing party to the existence of that issue.'" *Wells v. Portland Yacht Club*, 2001 ME 20, ¶ 5, 771 A.2d 371 (quoting *Farley v. Town of Washburn*, 1997 ME 218, ¶ 5, 704 A.2d 347).

Here, the issue was not raised before the Board. Instead the Kurlanskis fully participated in the de novo hearing without dispute.[2] Therefore, they waived this argument since the Board was not given the opportunity to address it.

### c. Existence of Non-Conforming Use

Finally, the Kurlanskis argue that the Board's finding that lot 2 permitted parking eight times a year as a nonconforming use is not supported by substantial evidence. A nonconforming use is one that existed prior to the effective date of the ordinance. Falmouth, Me. Zoning Ordinance § 2.119 (Feb. 28, 1983). Additionally, the

---

[1] Additionally, the Board was correct to hear the case de novo. A board of appeals "may receive any oral or documentary evidence," unless there is an explicit local ordinance to the contrary. 30-A M.R.S. § 2691 (3)(D) (2011); *Stewart v. Town of Sedgwick*, 2000 ME 157, ¶ 7, 757 A.2d 773. Upon review of section 8 of the Town's ordinance, there is no explicit indication that the Board should not review the case de novo.

[2] The Kurlanskis argue that the new CEO was biased in his decision and that he did not properly review the situation. They also argue that since he was not present at the hearing, they were unable to properly question him. Any of his possible biases were overcome, however, since the Board considered the evidence de novo.

5

earlier use must have been actual and substantial. *Town of Orono v. Lapointe*, 1997 ME 185, ¶ 13, 698 A.2d 1059. The Law Court set forth a three-part test to determine whether a property's use is nonconforming:

> (1) whether the use reflects the 'nature and purpose' of the use prevailing when the zoning legislation took effect; (2) whether there is created a use different in quality or character, as well as in degree, from the original use, or (3) whether the current use is different in kind in its effect on the neighborhood.

*Keith v. Saco River Corridor Comm'n*, 464 A.2d 150, 155 (Me. 1983).

The date PYC acquired the lot is irrelevant to the analysis of nonconforming status since "it is the building or the land that is 'grandfathered' and not the owner." *Keith*, 464 A.2d 150, 154 (Me. 1983). The Board considered how the lot was used prior to the enactment of the relevant ordinance provision, but the parties disagree about the facts concerning the property's prior use.

At the hearing Ellen Snyder, the daughter of the former owner of lots 1 and 2 who lived on the property for several years, testified on behalf of the Kurlanskis regarding parking on lot 2 prior to 1983. (PYC's Br. 2; R. 315.) She testified that she did not recall any events where PYC used lot 2 for parking while she lived on the property. (R. 321.) PYC presented multiple witnesses who testified that PYC used the lot for parking several times a year. (R. 322–324.) One witness said "there were eight to ten times a season when they would use this property to park, but most would be for a Saturday daytime only." (R. 323.) The Kurlanskis admit that "there may have been occasional 'actual' permissive use of lot 2 and other surrounding properties for overflow parking for special events" but they deny that the use was substantial. (Pet.'s Br. 28.)

Regarding the conflicting testimony the Board said it "finds the testimony of witnesses to be irreconcilable in certain instances and respects. In making its findings,

6

the Board assessed and weighed the credibility of witnesses, and reviewed documents and correspondence of the parties included in the record, including correspondence made at or about the time of important dates in the long standing dispute that has simmered, if not boiled, for over a decade." (R. 4.) Concerning prior use the Board found that PYC used lot 2 for overflow parking on an occasional basis for special events and as necessary for Thursday night races or extremely busy weekends. (R. 5.)

Based on the evidence before it, the Board allowed PYC to use the lot for overflow parking, but limited the use to up to 8 events per year.[3] Although an inconsistent conclusion could be drawn from the evidence, the Board's decision is properly supported with substantial evidence.

**The entry is:**

The Town of Falmouth's Board of Zoning Appeal's decision is **AFFIRMED**.

DATE: May 9, 2012

Roland A. Cole
Justice, Superior Court

---

[3] The Kurlanskis also argue that the nonconforming use changed after the enactment of the zoning ordinance because the lot was only used for parking up to three times a year for several years. The facts indicate that the number of times the lot is used for parking throughout the years has varied. Using the lot for eight events per year is still occasional use, which is supported by substantial evidence.

7

Date Filed __12-07-10__ __Cumberland__ Docket No. __AP-10-44__
County

Action __80B Appeal__

KATHLEEN KURLANSKI                    TOWN OF FALMOUTH
ZBIGNIEW J. KURLANSKI                 THE PORTLAND YACHT CLUB

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
|  | AARON BURNS ESQ (TOWN OF FALMOUTH) |
| ZBIGNIEW J. KURLANSKI, ESQ. | DAVID LOURIE ESQ (PORTLAND YACHT CLUB) |
| PO BOX 46 |  |
| PORTLAND, ME 04112 |  |
|  |  |
| KRISTINA KURLANSKI ESQ/20 FEDERAL STREET/BRUNSWICK |  |
| PETER M. MCGEE, ESQ. |  |
| 80 EXCHANGE STREET |  |
| PORTLAND, ME 04101 |  |

Date of
Entry