STATE OF MAINE                          SUPERIOR COURT
YORK, SS.                               CIVIL ACTION
                                        DOCKET NO. CV-11-263


CLAYTON S. ROSE and
JULIANNE H. ROSE,

Plaintiffs,

v.                                              **OPINION**

ROBERT DIBERTO,

Defendant.


## I.     Background

This case concerns the use of Greystone, a historic waterfront mansion property situated in the York Cliffs area of Cape Neddick. Plaintiffs Clayton and Julianne Rose ("the Roses") bring suit seeking an injunction to restrain Defendant Robert DiBerto[1] ("DiBerto") from using Greystone for weddings and other functions, which they allege violates a restrictive covenant encumbering the property, constitutes a nuisance, and overburdens their easement to use the roads leading to their property. The Roses also assert an interest in a strip of lawn along the border of the Rose and DiBerto properties. DiBerto brings counterclaims for trespass and invasion of privacy.

### A. Procedural History

The Roses initiated this action by a complaint filed on November 18, 2011. On August 13, 2012, this court granted a preliminary injunction restraining DiBerto from

---

[1] DiBerto has been appeared both in his individual capacity and as trustee of the Apple Trust, which owns Greystone.

1

using Greystone for weddings and other functions. A three-day bench trial was held in February 2015.

### B. Facts

Considering the credible testimony, exhibits, stipulations and evidence admitted at trial, the court makes the following findings of fact.

### 1. The Properties, Deeds, and Restrictions at Issue

The Roses own the property at 5 Anbelwold Circuit in York ("the Rose property") by a deed recorded at Book 15912, Page 260 in the York County Registry of Deeds. DiBerto, trustee of the Apple Trust, owns the neighboring property, 3 Anbelwold Circuit ("Greystone"), which feautures a nineteenth-century era mansion known as Greystone Manor. The Greystone deed is recorded at Book 3075, Page 248. The Greystone and Rose properties appear on the York Cliffs Improvement Company subdivision plan, dated January 1, 1893, recorded at Book 4, Page 30. As depicted on the 1893 plan, Greystone is comprised of lots 43, 44, 45, 59, and 60, while the Rose property is lot 61.

An 1893 deed from York Cliffs Improvement Company to Joseph N. Kinney contained the following covenant ("the Covenant"):

> First. To use said parcel for residence purposes only, and not to erect or suffer to be erected on such lands any stables, windmill, or other objectionable outhouse, or any cesspool or privy vault unless specifically authorized under the seal of the York Cliffs Improvement Company and not to so use or occupy any portion of said land as to injuriously affect the use, occupation or value of adjoining lots for residence purposes, or the neighborhood wherein said lots are situated.

(Pl.'s Ex. 1.) The deed further provided that "breach of this covenant may be enjoined upon application of the York Cliffs Improvement Company, its successor or assigns," and "that these covenants are to be taken as running with the land." (Id.) At the time of the

2

1893 deed to Kinney, the York Cliffs Improvement Company retained the land that later became lot 61, which presently comprises the Rose property.

Greystone was conveyed to DiBerto as trustee of the Apple Trust by a deed from M.F. Douglas dated April 27, 1983, and recorded at Book 3075, Page 249 in the York County Registry of Deeds. DiBerto's deed expressly referenced the 1893 deed to Kinney containing the Covenant:

> Reference for title is made to the deed by the York Cliffs Improvement Company to Joseph N. Kinney, dated November 3, 1893, duly recorded with the York County Registry of Deeds in Book 453, Page 469. Said premises are conveyed subject to the restrictions, covenants and agreements therein contained.

(Pl.'s Ex. 48.)

## 2. The Weddings and Events at Greystone

The Roses purchased 5 Anbelwold Circuit in the summer of 2010. They selected 5 Anbelwold Circuit because the home met their desire to reside in a quiet, peaceful neighborhood. In late August or early September 2010, the Roses observed a wedding occurring at Greystone that the Roses assumed was for someone who resided there. When another wedding occurred soon after, the Roses approached the Town of York and surrounding neighbors about the matter, only to learn Greystone had been used for weddings for some time.

The wedding events held at Greystone are fairly typical for a wedding that entertains up to several hundred guests.[2] The wedding ceremonies often occur on the Greystone lawn with an ocean view backdrop. Rows of chairs are set up for guests to

---

[2] Most of the Plaintiffs' evidence presented at trial regarding the nature of weddings and the use of Greystone was unrebutted by the Defendant. The Defendant takes the position the restrictive covenant at issue does not apply or has not been breached by the use of Greystone for weddings.

observe the ceremony. Large white event tents are rented and set up adjacent to Greystone Manor. Caterers, bartenders, DJs, florists, portable toilet companies, and other event vendors arrive in advance to set up. During the event, guests park dozens of cars on the lawn, with up to 60 to 70 cars parked. Limousines, party buses, school buses, trolleys, and other large vehicles shuttle additional attendees to the event. A steady stream of traffic enters the neighborhood before the event and exits thereafter. The private roads of the neighborhood are not sufficiently wide in many areas to allow two cars to pass one another; one car must therefore pull off to the side to allow the other to pass. The arrival of dozens of cars and large vehicles around the same time interferes with the use of the roads by other residents.

In addition to traffic, parking, and the visual impacts, the wedding events create substantial noise and odors. The celebrations create noise from loud music, amplified announcements and speeches, guests' voices, set up and clean up commotion, and guests drinking and dining, all of which can be heard from surrounding properties; sometimes even from inside the home. Caterers often cook outside and use grills to prepare large amounts of food. The large-scale cooking generates smoke and other odors that waft off the property. As the night goes on, the volume of the music and guests' voices increase. The music reaches such a volume that vibrations from the bass can be felt from inside neighboring homes. When the wedding concludes, boisterous departing guests can be heard singing, yelling, and driving away. Into the evening of the event and the following day, vendors pack up and remove equipment and waste.

### 3. The Nature of the Use and Other Activities

4

Greystone is maintained as neither a strictly residential property nor as a commercial wedding venue. Up to around five or six weddings occurred per year, though fewer since the Roses began this action (none in 2013 due to this court's preliminary injunction and two in 2014). The property has also been used for other events and functions, including as the set of the film "Bed and Breakfast" starring Roger Moore, an L.L. Bean photo shoot, and various business meetings.

The Defendants have on occasion rented Greystone to family and friends for weddings without receiving compensation. Most wedding events, however, have been compensated with rental fees ranging from $1,000 up to $10,000. DiBerto does not advertise the availability of Greystone Manor for rent. Prospective rental opportunities instead reach him by word-of-mouth, often through past renters and their event planners and vendors. DiBerto carries a commercial insurance policy on the property and reports rental income to state tax authorities as business income.

### 4. Zoning Enforcement by the Town of York

In the mid-1990s, the use of Greystone for wedding events was brought to the attention of zoning authorities in the Town of York. The Code Enforcement Officer at the time, Timothy DeCoteau ("CEO DeCoteau"), received a number of complaints from neighbors about noise and traffic. CEO DeCoteau issued a notice of violation that alleged the use of Greystone as a wedding venue was not an authorized accessory use in the residential zone. The Town thereafter imposed restrictions on noise levels pursuant to the sound ordinance and conditions to address traffic and parking issues.

### 5. Events Leading to this Suit.

5

In October 2011, Plaintiff Clayton Rose contacted DiBerto in an attempt to convince him to cease hosting wedding events at Greystone. When they spoke, DiBerto refused to stop, but offered to meet with Rose to address his concerns on October 30, 2011. Rose drove from Massachusetts to meet with DiBerto at the appointed time, but DiBerto was not home and did not respond to phone calls. Rose thereafter continued to attempt to reach DiBerto to no avail. The Plaintiffs commenced suit soon after in November 2011.

### 6. The Disputed Area

Also at issue in this case is an 834-square-foot area of lawn ("the lawn area") between the Greystone and Rose lots. The Prefrontaines, Gallairds, and Roses have all maintained the lawn area as if it were their own property, although the area encroaches into Greystone. The lawn area is a relatively small portion of the backyard lawn at 5 Anbelwold Circuit that extends to a line of shrubs and vegetation separating the lot from Greystone. The Prefontaines owned 5 Anbelwold Circuit from 1984 until 1999 when they conveyed to the Gallairds who thereafter conveyed to the Roses in 2010. The shrub line, which separates the lawn area from the brush that separates the properties, has remained the same over the years.

When Robert Prefontaine lived at 5 Anbelwold Circuit, from 1984 until 1999, he and his family used the lawn area continuously for family outings, football games, and had landscapers maintain the lawn area by seeding, fertilizing, and mowing the grass. DiBerto never objected to Prefontaine caring for and using the lawn area. Prefontaine never asked for permission to use the area. DiBerto himself never used or had any other party care for the law area. Prefontaine believed he had the right to use the lawn area as

6

his own property. Prefontaine did not, however, maintain the shrub or woods area beyond the grass.

Charles Gallaird had landscapers care for and maintain the lawn area by fertilizing and mowing the grass throughout the time the Gallairds lived at 5 Anbelwold Circuit, from 1999 until 2010. Gallaird and his family walked on the lawn area throughout that time. Gallaird never asked DiBerto permission to use or maintain the lawn area. He never saw DiBerto or his guests use or care for the lawn area. Sometime after acquiring the property, Gallaird realized the lawn encroached into Greystone, but continued to use and maintain the lawn area as his own and in the same manner as the rest of the yard.

Like the Prefontaines and Gallairds, the Roses have used and had landscapers maintain the lawn area for the entirety of their residence at 5 Anbelwold Circuit. The Roses never asked for permission to use or maintain the area, DiBerto never objected to the Roses using and maintaining the area, and the Roses never saw DiBerto or his guests using or maintaining the area. The Roses believed the lawn area was part of their property until a 2011 survey.

## II.    Discussion

### A. The Restrictive Covenant Applies to Greystone and is Enforceable

The Defendant argues the restrictive covenant either does not apply to Greystone or is not enforceable by the Plaintiffs. The court concludes the Covenant does apply and is enforceable by the Plaintiffs.

The Defendant's deed expressly references the 1893 deed from York Cliffs Improvement Company to Joseph N. Kinney that contained the Covenant, and provides Greystone was "conveyed subject to the restrictions, covenants and agreements therein

7

contained." (Pl.'s Ex. 48.) The Covenant therefore encumbers Greystone. In order to enforce the Covenant, the Plaintiffs need only demonstrate the original grantor retained the benefitted land and intended for the benefit to run with the retained land. *O'Neill v. Williams*, 527 A.2d 322, 323 (Me. 1987); *Herrick v. Marshall*, 66 Me. 435, 439 (1877); *see also* Restatement (Third) of Property: Servitudes § 8.1 (2000). The Plaintiffs satisfy both criteria.

First, the benefit of the Covenant—the right to enforce—was unambiguously intended to run with the land. The deed explicitly provided that "breach of this covenant may be enjoined upon application of the York Cliffs Improvement Company, its successor or assigns," and "that these covenants are to be taken as running with the land." (Pl.'s Ex. 1.) Second, at the time of the grant, the York Cliffs Improvement Company retained lot 61, the Rose property, which thereby benefitted from the Covenant. As successors to the interest held by the York Cliffs Improvement Company, the Plaintiffs are entitled to enforce the restriction. *Leader v. La Flamme*, 111 Me. 242, 245, 88 A. 859, 861 (1913) (holding reservation created servitude for the benefit of subsequent grantees who own parcels carved from common tract retained by the grantor-developer). Because the burden and benefit of the restriction ran with the land, the specific Covenant language did not need to appear in every deed in the chain of title to encumber Greystone and remain enforceable by the Plaintiffs.

The Plaintiffs may enforce the Covenant. The court next interprets the deed to determine whether Greystone's use for wedding activities violates the Covenant.

### B. Deed Construction and Restrictive Covenants

"The proper construction of a deed is a question of law." *Bennett v. Tracy*, 1999 ME 165, ¶ 7, 740 A.2d 571. Interpretation of a restrictive covenant is similarly a question of law. *River Dale Ass'n v. Bloss*, 2006 ME 86, ¶ 6, 901 A.2d 809. "The language must be given its ordinary meaning, and if there is no ambiguity the plain meaning controls." *Id.* "Covenants and agreements restricting the free use of property are strictly construed against limitations upon such use. Such restrictions will not be aided or extended by implication or enlarged by construction." *Naiman v. Bilodeau*, 225 A.2d 758, 759 (Me. 1967). The party seeking to enforce the covenant may not restrict the use any further than necessary to enforce the express terms or the clear implication of the language in the deed. *See Boehner v. Briggs*, 528 A.2d 451, 453 (Me. 1987).

### C. The Covenant

The relevant portions of the Covenant state: "To use said parcel for residence purposes only . . . and not to so use or occupy any portion of said land as to injuriously affect the use, occupation or value of adjoining lots for residence purposes, or the neighborhood wherein said lots are situated." Two separate restrictions appear in this Covenant—one that limits the uses to "residence purposes only" and the second that prohibits uses that "injuriously affect the use, occupation or value of adjoining lots for residence purposes." The Plaintiffs contend DiBerto has operated Greystone as a commercial wedding rental venue, which violates both: A commercial use is not a use for "residence purposes" and the outdoor weddings with noise, traffic, and odors have "injuriously affect[ed]" the Plaintiffs' (and other neighbors') use of their properties. The Defendant responds that seasonal rentals for weddings and other events does not make

9

the use commercial and flatly denies that the use violates either restriction in the Covenant.

As creatures of private contract, restrictive covenants must be construed case-by-case, driven by particular language employed by the parties to the instrument. *Friedlander v. Hiram Ricker & Sons, Inc.*, 485 A.2d 965, 972 (Me. 1984) ("[T]he cardinal rule for the interpretation of deeds [being] the expressed intention of the parties, gathered from all parts of the instrument, giving each word its due force, and read in the light of existing conditions and circumstances.") Deed language can sometimes suffer from archaic, inartful boilerplate perpetuated in grants over many years. The law, however, assumes the drafter knew what he or she was doing and aims to effectuate the intent expressed in the deed. *See Labonte v. Thurlow*, 2008 ME 60, ¶ 12, 945 A.2d 1237.

The Covenant language is unambiguous—"use said parcel for residence purposes only" means that Greystone must be used principally as a home or dwelling place. *See, e.g., Sanseverino v. Gregor*, 2011 ME 8, ¶ 9, 10 A.3d 735 (holding "single-family residential purposes" restriction unambiguously prohibited timber harvesting and road construction); *Bennett*, 1999 ME 165, ¶ 10, 740 A.2d 571 (residential use restriction prohibited commercial woodworking shop); *Boehner*, 528 A.2d at 453 (one family dwelling restriction prohibited multi-family dwelling).

The parties spill much ink over whether renting Greystone is a commercial use. A commercial use is not a residential use, but a landowner need not necessarily launch a full-blown commercial enterprise to violate a residential use covenant. While concluding the use is "commercial" would inevitably lead to the conclusion the use violates a residential restriction, *Bennett*, 1999 ME 165, ¶ 10, determining whether the use is

10

"commercial" is unnecessary. *See Windham Land Trust v. Jeffords*, 2009 ME 29, ¶ 26, 967 A.2d 690 (declining to define "commercial" to construe residential use restriction where "commercial" did not appear in conservation easement). As in *Jeffords*, the first restriction in the Covenant neither mentions nor expressly prohibits commercial uses, but limits uses to "residence purposes only."

Using Greystone for purposes other than a residence does not necessarily violate the restriction. The ultimate question is whether Greystone has been used in a manner *inconsistent with* the residence purpose restriction. *See ALC Dev. Corp. v. Walker*, 2002 ME 11, ¶ 12, 787 A.2d 770 (use of parcel for roadway to adjoining subdivision inconsistent with single-family residential use restriction). This is necessarily a matter of degree.

In gauging whether a residential use restriction has been breached, courts look to the intensity of the non-residential use, in particular whether the use is "incidental" to the primary residential use. The inquiry is highly fact-dependent and does not turn on any single consideration. *See Hill v. Lindner*, 2009 ND 132, ¶¶ 13-14, 769 N.W.2d 427 (concluding licensed day care facility was more than incidental and thus violated "residential purposes only" restrictive covenant).

Whether a particular use exceeds a residential use restriction often arises in the zoning context, which provides useful insight here.[3] *See, e.g., Wachusett Props. v. Town of China*, CV-07-329, 2008 Me. Super. LEXIS 211, *7 (Me. Super. Ct. Sept. 9, 2008) (stating rental of cabins for a fee does not render use "commercial" and cabins could still be regulated as "residential"); *Your Home, Inc. v. Portland*, 432 A.2d 1250, 1260 (Me. 1981) (holding renting mobile homes did not violate residential use zoning ordinance).[4] Hosting as few as five weddings a year can violate residence-only zoning. *See DiGiovanni v. Pope*, 20 LCR 44, 52 (Mass. Land Ct. 2012) (Piper, J.) (holding rental of residential waterfront property to non-residents "five times during a single season for outdoor wedding receptions surpasses accessory use and becomes a primary use" and violated residential zoning).

The non-residential use's impact on the surrounding neighborhood is also important to the "incidental" analysis. This reflects reluctance to prohibit a non-residential use that occurs strictly within the home with a de minimis impact on the neighborhood. *See, e.g., N. H. Engle & Sons, Inc. v. Laurich*, 240 N.E.2d 9, 13 (Ill. App.

---

[3] It bears emphasis that although Town zoning ordinances and restrictive covenants both restrict land use, they are substantively distinct. *Whiting v. Seavey*, 159 Me. 61, 68, 188 A.2d 276, 280 (1963); *see also Bennett*, 1999 ME 165, ¶ 11, 740 A.2d 571 ("It is settled law in Maine that zoning and covenants are separate realms of land use control and that neither directly influences the interpretation of the other."). The obligations and rights flow to different parties: zoning restricts the land for the community, while restrictive covenants impose restrictions for private parties. *Grenier v. Inhabitants of Wells*, CV-86-97, 1987 Me. Super. LEXIS 121, *6 (Apr. 23, 1987). Compliance with residential use zoning is not necessarily compliance with a covenant restricting uses to residential purposes only. Importantly, the fact the Town has not pursued enforcement does not necessarily mean Greystone complies with zoning because such decisions are reserved to the municipality's prosecutorial discretion. *Adams v. Town of Brunswick*, 2010 ME 7, ¶ 10, 987 A.2d 502.

[4] As these cases demonstrate, renting for profit does not by itself render a use non-residential. *See Silsby v. Belch*, 2008 ME 104, ¶¶ 12-13, 952 A.2d 218 (holding residential apartment rental did not violate covenant, reasoning the tenant stands in the shoes of the owner to assume the predominantly residential character of the use). Receiving rental fees is one merely factor to consider.

Ct. 1968) (contrasting author using part of the home as a business office to write novels with doctor using home as clinic to see roughly 30 patients per day in construing residence purposes covenant); *see also* Rohan & Kelly, *Zoning and Land Use Controls* § 40A.03 ("So long as the commercial use is a secondary one, conducted on a small scale relative to the principal use, it will presumably not harm—or inflict only minimal harm upon—other residential users.") This raises the second restriction in the Covenant: "not to so use or occupy any portion of said land as to injuriously affect the use, occupation or value of adjoining lots for residence purposes, or the neighborhood wherein said lots are situated." This restriction is similarly unambiguous. In addition to limiting the use to "residence purposes," the Covenant prohibits a use that negatively impacts the use, occupation, or value of the other residential properties in the neighborhood.

The court concludes the Defendant's use of Greystone for wedding event rentals violates both Covenant restrictions. As to the "residence purposes" restriction, the cumulative wedding rental use exceeds ordinary incidental uses of one's residence. Hosting an isolated wedding for a family member or close friend would not be problematic. Greystone has exceeded such a modest, private use. DiBerto rents Greystone to unrelated third parties who do not reside there. He collects fees for most of these rentals. Although DiBerto intends to be selective about whom he rents to, he often does not know the parties personally; many prospective renters come to him through the event planners that organized past weddings at Greystone. Greystone is not necessarily a commercial wedding venue, but the use need only be inconsistent with the Covenant to constitute a breach.

The impact on the surrounding neighborhood is more evident. The wedding rental use has clearly violated the second restriction, which prohibits uses that "injuriously affect the use, occupation or value of adjoining lots for residence purposes, or the neighborhood wherein said lots are situated." It is true that the weddings are seasonal and occur six or fewer times per year. The intensity and impact of those events, however, is substantial. Large wedding ceremonies and receptions with up to several hundred guests have created significant traffic, noise, and odors, all of which affected the use, occupation, and value of the neighboring properties. An occasional wedding would not necessarily breach the covenant, but the multiple annual weddings and the manner in which they were conducted is plainly inconsistent with a neighborhood of properties restricted to residence purposes.

From the plain language of the Covenant, the two restrictions in the covenant work in concert. The intensity and character of the wedding rentals is inconsistent with the Covenant's intent to maintain a residential neighborhood for the benefit of residents. *See Walker*, 2002 ME 11, ¶ 12, 787 A.2d 770. The court therefore finds and concludes that the Defendant breached the Covenant.

### D. The Remedy: Injunctive Relief

Restrictive covenants may be enforced by injunction. Horton & McGehee, *Maine Civil Remedies* § 5-5(b)(4) at 112 (4th ed. 2004); *Bennett*, 1999 ME 165, ¶ 2, 740 A.2d 571 (enforcing residence purpose covenant by enjoining defendant from operating any sort of commercial enterprise). To obtain a permanent injunction, a claimant must establish "(1) the party would suffer irreparable injury if the injunction is not granted; (2) such injury outweighs any harm that granting injunctive relief would inflict on the party

14

opposing the injunction; (3) the public interest will not be adversely affected by granting the injunction; and (4) the plaintiff succeeds on the merits." *Jeffords*, 2009 ME 29, ¶ 41, 967 A.2d 690. The court "weighs all the criteria together in determining whether injunctive relief is proper in the specific circumstances of the case." *Id.*

When enforcing covenants, the Restatement envisions a similar weighing of factors in crafting appropriate relief, considering (1) the nature and purpose of the covenant, (2) the parties' conduct, (3) the fairness of the covenant, and (4) the costs and benefits of enforcement to the parties and the public. Restatement (Third) Property: Servitudes, § 8.3. Equity is critical. 34 Am. Jur. 3d *Violation of Restrictive Covenant* § 10 ("Injunctive relief is equitable in nature, and is the most commonly requested remedy in actions to enforce restrictive covenants."). The court must engage in some balancing to craft an appropriate injunction that enforces the covenant effectively. *See* Dobbs, *Law of Remedies*, § 5.7(2) ([B]alancing or discretion is invoked . . . when the court fixes the exact scope and commands of the injunction issued.")

The Plaintiffs request the court enter a permanent injunction restraining the Defendant in a manner that would not only stop the weddings, but also prohibit seemingly any social gathering by strictly limiting the number of guests, cars, and imposing other conditions. The court declines to impose quotas and specific conditions on Greystone. Such an injunction would go beyond the plain language and intent of the rights created by the Covenant. *See Naiman*, 225 A.2d at 759 ("[R]estrictions will not be aided or extended by implication or enlarged by construction."); *see also Boehner*, 528 A.2d at 453 (rejecting interpretation of "a one family dwelling" restriction to permit only a single structure with four walls as overly narrow).

15

To ban all future weddings and social events would enlarge the restriction in a manner not intended by the original grantor and contravene "the fundamental principle that a property owner may use his land as he pleases for all lawful purposes." *Johnson v. Whitten*, 384 A.2d 698, 701 (Me. 1978). Instead, with all the factors above in mind, the court concludes that weddings at Greystone may only be held for residents of the property and their relatives.[5] This injunction only restricts wedding uses to ensure compliance with the Covenant; other events would remain permissible, so long as they remained consistent with the Covenant.

Hosting a wedding for a family member is a special occasion that is entirely consistent with a residential use. What became impermissible, and ultimately breached the Covenant, were regular annual wedding rentals for a fee to persons unrelated to Greystone residents that impacted an otherwise quiet neighborhood. This is the activity the Plaintiffs brought suit to restrain. No evidence was presented that other owners have so used their property. The wedding rentals transformed from a minor, incidental use to a recurring intensive use of the property that affected the Plaintiffs and the neighborhood. Balancing the Plaintiffs' rights protected by the Covenant against the Defendant's right to freely use his property, the court concludes an injunction limiting wedding events to residents and family members best serves the intent and fairness of the Covenant, the cost and benefits to the parties, the relevant equities, and the public interest.

The Plaintiffs have requested a specific injunction because they believe the Defendant will not comply with an injunction couched in general terms. If the Defendant

---

[5] Under such a restriction, the weddings the Defendant held for his daughter and cousin would be permissible, while the wedding for his son's college roommate would be prohibited. Presumably an event for a resident or family member would be far less frequent than the previous status quo, which would appropriately and effectively limit Greystone's use to primarily residence purposes in a manner that would not injuriously affect the surrounding properties.

violates or attempts to violate this court's order, the Plaintiffs are entitled to commence contempt proceedings and seek appropriate relief. *See generally* 3 Harvey, *Maine Civil Practice*, Rule 66 Contempt Proceedings at 341 (3d ed. 2012). In the event of such a proceeding, the court could consider punitive and remedial sanctions. *See id.*

### E. Nuisance and Interference With An Easement

The Plaintiffs also bring several additional counts alleging that the Defendant's use constitutes a statutory and common law nuisance and interferes with their easement to access their property.

#### 1. Nuisance

Plaintiffs may assert nuisance claims pursuant to statute or the common law. By statute, plaintiffs may bring suit to redress a public or private nuisance. 17 M.R.S.A §§ 2702, 2802. A common law nuisance is proven by reference to the following elements:

(1) The defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; (2) There was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended; (3) The interference that resulted and the physical harm, if any, from that interference proved to be substantial . . . The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct; (4) The interference that came about under such circumstances was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land. . . .

*Charlton v. Town of Oxford*, 2001 ME 104, ¶ 36, 774 A.2d 366.

The Defendant's activity has, as discussed above, interfered with the Plaintiffs' use and enjoyment of their property and breached the Covenant. Unlike a claim to enforce a covenant, however, nuisance requires the Plaintiffs to show the Defendant's injurious activity reduces the value of their property. *Charlton*, 2001 ME 104, ¶¶ 38-40 & n.10, 774 A.2d 366. Considering the admissible testimony and exhibits submitted at trial, the court is not persuaded that the value of the Plaintiffs' property has been diminished as a result of the wedding rental activity. The nuisance claim therefore fails.

2. Interference with Easement

Plaintiffs further allege that increased traffic during wedding events overburdens their right-of-way to access their property. "Whether an easement is overburdened is a question of fact." *Flaherty v. Muther*, 2011 ME 32, ¶ 74, 17 A.3d 640. The court considers whether the alleged overburdening use is unreasonable or beyond the scope contemplated and authorized by the grantor. *See Lakeside at Pleasant Mt. Condo. Ass'n v. Town of Bridgton*, 2009 ME 64, ¶ 18, 974 A.2d 893.

Plaintiffs possess an implied right-of-way over the private roads of the neighborhood based on the recording of a subdivision plan. Plaintiffs testified that car,

18

truck, and bus traffic during Greystone events interferes with their use of the road to access their property. This use, however, does not rise to the interference ordinarily alleged in overburdening cases, such as a permanent obstruction or year-round continual use by third parties. The court concludes the Plaintiffs have not proved the Defendant's occasional use of Greystone for events and the accompanying traffic has overburdened their easement.

### F. The Lawn Area: Adverse Possession

The court next turns to the Plaintiffs' claims related to the disputed portion of lawn adjoining the properties. To prevail on an adverse possession claim, a plaintiff must prove "by a fair preponderance of the evidence" that the use was (1) "actual"; (2) "open"; (3) "visible"; (4) "notorious"; (5) "hostile"; (6) "under a claim of right"; (7) "continuous"; (8) "exclusive"; and (9) of a duration exceeding the twenty-year limitations period. *Striefel v. Charles-Keyt-Leaman Pshp.*, 1999 ME 111, ¶¶ 3, 6, 733 A.2d 984. The Law Court has recently clarified that activities sufficient to establish adverse possession must be considered "in the aggregate, i.e., in the context of a claimant's overall use of the property." *Harvey v. Furrow*, 2014 ME 149, ¶ 19, 107 A.3d 604.

#### 1. Actual

"'Actual' possession and use consist of a literal, physical entry upon the land, and are manifested by 'acts of occupancy [that] indicate a present ability to control the land and an intent to exclude others from such control.'" *Striefel*, 1999 ME 111, ¶ 9, 733 A.2d 984. Cultivating and maintaining a lawn combined with other use activity is sufficient to exercise actual possession. *Harvey*, 2014 ME 149, ¶¶ 12, 18, 107 A.3d 604. The Prefontaines, Gallairds, and Roses (and landscapers at their direction) all actually

19

occupied, used, and maintained the lawn area in the same manner they occupied, used, and maintained the rest of the backyard and thus actually possessed the land.

### 2. Exclusive

"Exclusive" means the "possessor is not sharing the disputed property with the true owner or public at large." *Striefel*, 1999 ME 111, ¶ 17, 733 A.2d 984. The Plaintiffs and their predecessors-in-title maintained exclusive possession; neither DiBerto and his guests nor the public used the lawn area. The Plaintiffs' possession was exclusive.

### 3. Hostile

"'Hostile' simply means that the possessor does not have the true owner's permission to be on the land." *Id.* ¶ 13. The Prefontaines, Gaillards, and Roses never obtained, and DiBerto never granted, permission to use the lawn area and thus the Plaintiffs satisfy the "hostile" element.

### 4. Open, Visible, and Notorious

"'Open means without attempted concealment. 'Visible' means capable of being seen by persons who may view the premises. 'Notorious' means known to some who might reasonably be expected to communicate their knowledge to an owner maintaining a reasonable degree of supervision over his property." *Id.* ¶ 11. "Such notice need not be actual; it is sufficient to prove acts so open[, visible,] and notorious that the owner's knowledge of them and of their adverse character may be presumed." *Id.* While there was no evidence presented that DiBerto knew the Prefontaines, Gaillards, and Roses were openly using and maintaining the lawn area, actual notice is not required. The Prefontaines, Gallairds, and Roses all exclusively occupied and maintained the lawn area

20

in a manner that would be apparent to an observer, which is sufficient to place the true owner on notice.

The court is particularly persuaded by the fact that the Prefontaines, Gallairds, and Roses' total use and maintenance of the lawn area, in the aggregate, was entirely consistent with the use and maintenance of the rest of their yard. *See Harvey*, 2014 ME 149, ¶ 19, 107 A.3d 604. This was a more intensive and pervasive than mere seasonal use of a vacant parcel. In addition to maintenance, Plaintiffs and their predecessors exclusively used the law area for picnicking, walking, playing, and other recreational uses, and did so more than seasonally. *Cf. Weinstein v. Hurlbert*, 2012 ME 84, ¶ 12, 45 A.3d 743 (holding seasonal grass mowing of vacant parcel insufficient to satisfy "notorious" and "hostile" elements where evidence other neighbors also used the property); *Weeks v. Krysa*, 2008 ME 120, ¶ 16, 955 A.2d 234 (holding seasonal use of vacant parcel, including children playing, persons walking, and clearing brush insufficient to place true owner on notice rights in jeopardy).[6] The Plaintiffs' use of the parcel was "comprehensive and complete," *Harvey*, 2014 ME 149, ¶ 20, and was thus sufficiently open, visible, and notorious to place the Defendant on notice.

### 5. Claim of Right

"'Under a claim of right' means that the claimant 'is in possession as owner, with intent to claim the land as [its] own . . .'" and not in recognition of the true owner's superior title. *Striefel*, 1999 ME 111, ¶ 14, 733 A.2d 984. The law was previously

---

[6] *Weinstein* and *Weeks* closely scrutinized the factual records developed at trial to apply a strict standard to establish an adverse possession claim. Both cases appear to have turned largely on the fact that the parcels at issue were vacant, which triggered Maine's open lands tradition doctrine under which permission is presumed. Case Note, *Weeks v. Krysa: Cultivating the Garden of Adverse Possession*, 62 Me. L. Rev. 289, 291 & n.10 (2010). This case is factually and legally distinguishable from those cases and closer to *Harvey*.

21

ambiguous as to whether a plaintiff who mistook a boundary line could successfully prove the claim of right element. *Id.* ¶ 15 n.9. The Law Court has since clarified the issue to firmly hold that an adverse possessor need not have a specific intent to assert an interest in another's land. *Dombkowski v. Ferland*, 2006 ME 24, ¶ 24, 893 A.2d 599. The mere fact an adverse possessor or their predecessors-in-title were unaware they were using land that was not theirs is thus no longer fatal to a claim. *Id.*

Both Prefontaine and Rose believed the lawn area was part of their yard; they were unaware the area was in fact part of the Greystone lot. Only Gallaird, after owning the property for several years, realized that the lawn area encroached into neighboring Greystone, but continued to use the area as his own. Under the pre-*Dombkowski* analysis, the Plaintiffs' adverse possession claim would fail because the Prefontaines and Roses possessed the lawn area under a mistake of fact as to ownership. As this element now only requires intentional possession as an owner without recognizing the true owner, which the Roses and Prefontaines accomplished, the Plaintiffs have proven the "under a claim of right" element.

### 6. Continuous

Continuous means "occurring without interruption" and "requires only the kind and degree of occupancy (i.e., use and enjoyment) that an average owner would make of the property." *Striefel*, 1999 ME 111, ¶ 16, 733 A.2d 984. The Prefontaines, Gallairds, and Roses used the lawn area without interruption frequently, if not year round, as a typical owner. In particular, they each hired landscapers to maintain the grass in the same manner as they cared for the rest of the yard. There was no break or abandonment in use and maintenance.

22

### 7. Requisite 20-year Period

A plaintiff must prove each of the above elements occurred simultaneously "for a period of at least twenty years." *Id.* ¶ 18. The Prefontaines satisfied each of the above elements during the entire time they owned 5 Anbelwold Circuit, from 1984 until 1999.[7] The Gallairds satisfied each of the above elements throughout the time they lived at 5 Anbelwold, from 1999 until 2010. The Roses satisfied each of the above elements from 2010 until the present. The adverse possession of the lawn area can be tacked together to satisfy the 20-year period because the Prefontaines, Gallairds, and Roses are all in privity.

The court concludes the Plaintiffs have proven adverse possession. Prevailing on the adverse possession claim subsumes their prescriptive easement claim. *See Baptist Youth Camp v. Robinson*, 1998 ME 175, ¶ 14, 714 A.2d 809; *see also* Alexander, *Maine Jury Instruction Manual* § 7-90 at 7-125 (2013 ed.) (illustrating prescriptive easement as

---

[7] The evidence presented regarding adverse possession was largely unopposed. Defendant chiefly argued that the Plaintiffs' claim fails on the theory that certain construction in 1994 disturbed the lawn area and interrupted the requisite 20-year period. This theory is based on an engineer's field notes and a sketch from 1992 that depicted a "squiggly" line intended to represent shrubs and brush and a 1994 temporary occupancy permit issued after a reconstruction of the residence with condition to "finish landscaping." The court credits Mr. Prefontaine's testimony that the lawn area and shrub line did not change during his ownership of the property.

23

lesser claim to consider if jury does not find adverse possession). The Roses and their successors have title in the lawn area.[8]

## G. The Counterclaims

Lastly, the Defendant asserts counterclaims for trespass and invasion of privacy. Judgment for the Plaintiffs on their adverse possession claim moots the trespass counterclaim. *See Labelle v. Blake*, 1998 ME 165, ¶ 9, 714 A.2d 145 (recognizing right to use property constitutes an affirmative defense to trespass claim).

Maine law adopts the Restatement elements for invasion of privacy. A plaintiff must establish the defendant intentionally intruded "upon the solitude or seclusion of another or his private affairs and concerns," in manner that "would be highly offensive to a reasonable person." *Nelson v. Me. Times*, 373 A.2d 1221, 1223 (Me. 1977). The Defendant presented no evidence that the Plaintiffs' conduct either subjectively offended DiBerto or would be "highly offensive" to a reasonable person. The claim therefore fails.

---

[8] The Plaintiffs also assert a claim for title by acquiescence, which requires they prove:

> (1) possession up to a visible line marked clearly by monuments, fences, or the like;
> (2) actual or constructive notice to the adjoining landowner of the possession;
> (3) conduct by the adjoining landowner from which recognition and acquiescence . . . may be fairly inferred; [and]
> (4) acquiescence for a long period of years such that the policy behind the doctrine of acquiescence is well served by recognizing the boundary.

*Grondin v. Hanscom*, 2014 ME 148, ¶ 11, 106 A.3d 1150. A line between properties created by lawn mowing has been held insufficient to establish a "visible line" such as "a monument, fence or the like." *Crosby v. Baizley*, 642 A.2d 150, 154 (Me. 1994). The claims most often contemplate a structure or other permanent marker to establish the line, but in one case, a hedge was sufficient where the true owner had notice of the claimed boundary. *Davis v. Mitchell*, 628 A.2d 657, 660 (Me. 1993). Here, the Plaintiffs claim the lawn area, defined as the lawn extending up to where the grass ends and the brush and shrubs begin. This line was not as clear or visible as a hedge. The court need not reach this issue because the Plaintiffs prevail and acquired title by way of adverse possession.

24

## III.    Conclusion

In light of the foregoing, the Plaintiffs are entitled to judgment on Counts I (Breach of Restrictive Covenants) and VII (Adverse Possession). Plaintiffs are entitled to an injunctive relief on Count I. The Defendant is hereby enjoined from renting Greystone to persons who are not residents of the property or members of the residents' family. The Defendant is entitled to judgment on Counts II (Statutory Nuisance), III (Common Law Private Nuisance), IV (Interference with Easement), V (Common Law Trespass), VI (Prescriptive Easement), and VIII (Title by Acquiescence). The Plaintiffs prevail on the Defendant's counterclaims.

The docket entry shall be:

> Judgment for the Plaintiffs as to Count I (Breach of Restrictive Covenants). The Defendant is hereby enjoined from using or renting the Greystone property for the purposes of holding a wedding for persons who are not residents of the property or members of the residents' family. "Resident" is defined as a person who owns and/or lives in the property as a home, though not necessarily as a primary residence. "Family" is defined as persons related by blood or marriage. Judgment for the Plaintiffs as to Count VII (Adverse Possession). The Plaintiffs have acquired the title to the disputed lawn area by adverse possession. The court hereby incorporates the description of the lawn area stated in Plaintiff's Exhibit 90 by reference; said description may be recorded in the Registry of Deeds. Judgment for the Defendants as to Counts II (Statutory Nuisance), III (Common Law Private Nuisance), IV (Interference with Easement), V (Common Law Trespass), VI (Prescriptive Easement), and VIII (Title by Acquiescence). Judgment for the Plaintiffs on the Defendant's counterclaims.

DATE:

9/9/15

_____
John O'Neil, Jr.
Justice, Superior Court

25

CV-11-263

ATTORNEY FOR PLAINTIFF:
GREG ORSO, ESQ.
ORSO LAW PA
439 YORK STREET
PO BOX 1229
YORK HARBOR, ME 03911

PRO HAC VICE
THOMAS HAYMAN, ESQ.
NELSON MULLINS RILEY & SCARBOROUGH LLP
ONE POST OFFICE SQUARE
30TH FLOOR
BOSTON, MA 02109

KYLE BJORN LUND, ESQ.
CETRULO & CAPONE
TWO SEAPORT LANE
BOSTON, MA 02110

ATTORNEY FOR DEFENDANT (AND TRUST)
CHRISTOPHER WYSKIEL, ESQ.
WYSKIEL BOC & TILLINGHAST, PA
561 CENTRAL AVENUE
DOVER, NH 03820